**WALLED LAKE DOOR COMPANY,**
**Petitioner-Cross Respondent,**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent-Cross**
**Petitioner.**

No. 71–3338.

United States Court of Appeals,
Fifth Circuit.

Feb. 1, 1973.

Guy Mitchell, Jr., Tupelo, Miss, for petitioner-cross respondent.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D. C., John J. A. Reynolds, Jr., Director, Region 26, N.L.R.B., Memphis, Tenn., John H. Ferguson, Washington, D. C., for respondent-cross petitioner.

Before WISDOM and INGRAHAM, Circuit Judges, and BOOTLE, District Judge.

WISDOM, Circuit Judge:

The Walled Lake Door Company, petitioner, seeks review of an order of the National Labor Relations Board finding the Company guilty of unfair labor practices. The Board filed a cross-application for enforcement of its order. The Board found that the Company had violated Sections 8(a)(5) and 8(a)(1) of the National Labor Relations Act, 29 U. S.C. § 151 et seq., by refusing to bargain with the Southern Council of Lumber and Plywood Workers, United Brotherhood of Carpenters and Joiners of America, AFL–CIO. After an election, the Board certified the Union as the exclusive representative of the Company's employees in its Tupelo, Mississippi, plant. The Company contends that the election and resulting certification were invalid

---

because of substantial and material last-minute misrepresentations by the Union which interfered with the employees' free choice and directly affected the result of the election. After a perfunctory ex parte investigation, the Board denied the Company's request for a hearing on its objections both in the representation proceeding and in the unfair labor practice proceeding. We decline to enforce the order.

The representation election, held on January 19, 1971, resulted in 26 votes for the Union and 22 against the Union. One vote was challenged; one ballot was void; four eligible employees did not vote.

The Company has five plants: in Gila Bend, Arizona; Cameron, Texas; Stanley, Virginia; Richmond, Indiana; and Tupelo, Mississippi. Two plants, Gila Bend and Richmond, are organized and represented by the same union involved in this case. During the year before the Tupelo election the Union was defeated 27 to 14 in an election at the Stanley plant.

The Company filed objections to the election on January 22, 1971. The target of these objections is a letter by the Union to the employees, apparently timed to deprive the employer of the opportunity effectively to rebut the misrepresentations. Some of the employees received the letter on the Saturday before the election on Tuesday, January 19, 1971; others received it on Monday, January 18. The letter did not come to the attention of the Company until Monday, the day before the election.

The letter contains a manifest misstatement of fact:

P.S. Join hands with employees of the 4 Walled Lake plants who are represented by unions.

The letter was signed, "Your Organizing Committee, Southern Council of Lumber and Plywood Workers, United Brotherhood of Carpenters and Joiners of America, AFL–CIO". Because of the source, it would seem reasonable for the employees to accept the statement as true. It is a fair inference that the next step in an employee's thinking would be to ask: If the employees in all of the Company's other plants are represented by the Union, why should not the Tupelo plant employees be represented by that same Union? In Union there is strength; as employees of a completely unionized company they would have more bargaining leverage than as employees of a nonunionized plant at Tupelo. Preceding the postscript, the letter recited a long list of benefits enjoyed by the employees at the unionized plants.[1] The

---

1. The letter stated:

HERE ARE SOME OF THE THINGS YOU WORKERS NEED

MORE MONEY in your pay check to meet today's all-time high cost of living to where you could enjoy a higher standard of living and put-up a few dollars for a "rainy day".

PAID HOLIDAYS that are paid in union plants (as many as eight) after you have served a reasonable probation period of 30 days.

PAID VACATIONS that are paid in union plants (one-two and three weeks) 1 week 1 year, 2 weeks 3 years, 3 weeks 10 years.

OVERTIME for work over eight hours in any one day, holidays (in addition to holiday pay) Saturdays and Sundays.

JURY DUTY—The Company to pay the difference between jury duty and what you would have made in an eight-hour day for the days you served on jury duty.

FUNERAL LEAVE—The Company to pay up to three days when a worker is off from work to attend the funeral of a member of his immediate family.

PENSION PLAN paid for by the company for a worker who has given the best years of his life to the company and has reached retirement age.

HOSPITALIZATION INSURANCE paid for by the company for you and your family, sufficient to meet today's cost of hospitals and surgical benefits.

LIFE INSURANCE paid for by the company sufficient to help a worker's family if the misfortune of death was to come to the bread winner.

REPORTING PAY paid for reporting for work and then not getting to work.

REST PERIODS—PAID rest periods for both morning and afternoon without make-up time.

record shows that the letter had the impact on a number of employees that one might expect.[2]

The Company attempted to combat the effect of the letter. President Quinif made a speech to the employees in which he gave the facts with respect to the number of plants that were unionized.

> JOB SECURITY where you will know your job is yours tomorrow and the next day and it won't be taken away because of a "whim" of the straw bosses.
> JOB CLASSIFICATIONS—All jobs classified eliminating jumping from job to job throughout the plant.
> JOB PROGRESSION—The right to be promoted by seniority and qualification to higher paying jobs.
> DISCHARGE—The right to have your day in the main office with your union officials if you have been unjustly discharged and paid for lost time if unjustly discharged.
> ARBITRATION—To carry all disputes to an impartial umpire to settle by the grievance procedure, eliminating strikes.

2. In July 1971 three members of the bargaining unit voluntarily gave sworn statements to the petitioners. Dianne Mayfield, a member of the bargaining unit, stated:

> I heard several comments made by other employees in the plant about this letter. These comments were just about like mine, if the other plants are unionized why shouldn't we be too. Some of the people who were for the Union said that Mr. Quinif [the company's president] lied when he said that the other plants were not unionized. . . . Among the employees, they kept pushing the part of the letter about the other four plants being unionized.

Joan McCord, a member of the bargaining unit, stated:

> I heard people talking about the letter. They were saying that if the other four plants were unionized, why shouldn't we be. I definitely know of people who voted for the Union who would not have had it not been for the letter. There was a lot of talk about this letter. I think many people believed the letter and not Mr. Quinif's speech.

Charles McCarthy, a member of the bargaining unit, said:

> My wife and I were very confused when we received the letter. . . . If there were four others unionized, I did not see why this last plant should not be unionized. The Union is strong and big,

and I feel that many employees believed that the Company was lying to them.

> Mr. Loden, a foreman, stated that two women in his department personally expressed to him that if the other four plants were unionized, there was no reason for this plant not to be union. He further stated that the employees believed the Union letter rather than Mr. Quinif's speech and felt that Mr. Quinif was lying to keep the Union out. Manard Grimes, a foreman, stated that the letter created the impression with the employees that all of the benefits listed were offered in the other Walled Lake plants. He said that one employee was extremely upset about the letter and made the statement that Mr. Quinif had misrepresented the extent of Union representation. This employee stated that since the other plants were unionized, he did not see why this plant should not be also. He said that even after the election was over, the employees still believed that the other plants were all unionized, and that Mr. Quinif's speech did not change their minds.

> Mr. Martin, the plant manager, stated that many employees expressed the opinion that the Tupelo Plant should be unionized if the other four were. He stated that some of the employees received the letter on Saturday, January 16, and others received it Monday, January 18. The election was held January 19, at 3:00 P.M. He further stated that the Company did not learn of the letter until Monday morning, January 18. He said that to many employees Mr. Quinif's last-minute denial of the Union's misstatement made it appear that Mr. Quinif, and not the Union, was misstating facts. He further stated that one of the main issues in the campaign had been daily overtime, and that the letter created the impression that daily overtime was being paid in Union plants and gave the impression that it was being paid in the other four Walled Lake Door plants. He stated that only weekly overtime is paid in the other four Walled Lake plants and that the Company did not have an opportunity to check competitor's plants which are unionized to determine whether daily overtime was paid by any of them.

He also corrected other misstatements in the letter. Eight employees did not attend his talk. There is a question whether, in view of the Union's letter, the speech helped or hurt the Company's efforts to counteract the letter. Many employees preferred to believe the Union's letter, not Quinif's speech.[3]

3. See footnote 2.

In its brief before this Court the Board, in a crepuscular euphemism, referred to the Union letter's misstatement about the number of plants that were unionized as an "arithmetical inaccuracy". And, according to the brief, insistence on "the *exact* number of union Company plants would be tantamount to insisting on 'absolute precision of statement' ".

After the Company filed its objections,[4] the Board conducted an ex parte investigation. It disposed of the reference to the other plants being represented by the Union, as follows:

Curtis testified that the postscript reference as to the four Walled Lake plants being represented by Unions was included on the basis of the information furnished him by the International Union, but he later learned that such information was in error.

The Regional Director found that there was no conflict in the evidence and, presumably, in the inferences to be drawn from the evidence. Of course, under Board procedure, the petitioner was not permitted to take a statement from the author of the letter, Union representative Curtis, was not furnished a copy of his statement taken by the Board, and was given no chance to cross-examine him or any employee since the Board refused the petitioner's request for a hearing. The Board considered the misrepresentations as being "permissible campaign propaganda".

■ The Board discussed the failure of these eight employees to hear Quinif's speech and, after disposing of six of the eight, based on the ex parte investigation, made the following finding as to the remaining two employees:

The final results of the election could not have been affected by the votes of the two employees who had no knowledge of the contents of the speech.

This is *an obvious* "arithmetical inaccuracy", for a change in two votes would have resulted in a tie. In addition, no one can say how many votes were affected by the letter. In a close election, the Board should scrutinize actions of both the Company and the Union that might mislead employees. And it should not trifle with irrefragable arithmetic.

The Board overruled the exceptions and adopted the Regional Director's findings and recommendations. It then filed a complaint against the Company for refusal to bargain. The Company filed an answer alleging that a full hearing would reveal that the employees were misled by material misrepresentations on the part of the Union and that such material misrepresentations influenced the votes which would have been in opposition to the Union and directly affected the outcome of the election. As we noted, at the time of the Board's ex parte investigation, the Company was not permitted to take statements from members of the bargaining unit, was not permitted to be present when the Board agent took such statements, and was not furnished copies of such statements; three members of the bargaining unit, however, voluntarily gave statements which were filed with the answer.[5]

The General Counsel of the National Labor Relations Board then moved for a summary judgment based on the pleadings. On October 12, 1971, the Board entered its decision and order now before this Court. The Board held that the Company was seeking to relitigate the issues which had been raised in the original objections and said:

In any event, the contents of these affidavits, even if established in an evidentiary hearing, would not warrant setting aside the election herein.

In a recent case, N.L.R.B. v. Overland Hauling Inc., 5 Cir. 1972, 461 F.2d 944, this Court summarized the pertinent law: "Under the Act there is no specific requirement that the Board conduct post-election hearings. N.L.R.B. v. O. K. Van

---

4. The Company furnished the Board the statements referred to in footnote 2.

5. See foonote 2.

Storage, Inc., 5 Cir. 1961, 297 F.2d 74. The law is clear, however, that the Board must grant a hearing if it appears that the objections raise 'substantial and material factual issues.'" But as Judge Brown wrote in N.L.R.B. v. Air Control Products of St. Petersburg, Inc., 5 Cir., 335 F.2d 245, 249: "If there is nothing to hear, then a hearing is a senseless and useless formality." In National Cash Register Company v. N.L.R.B., 5 Cir., 415 F.2d 1012, the court said: "The present case simply involves the interpretation of the effect of the Union leaflet on the exercise of a free choice by the voters in light of Company practices, agreements and contracts established on the records. . . . Likewise, this Court, under the circumstances, is not compelled to remand this case having found the record sufficient at this point for final determination."

■ Here, as the Regional Director found, there was no conflict in the evidence. The record shows that the letter had the impact on a number of employees that one might expect. Many employees preferred to believe the Union's letter, not Quinif's speech. The misrepresentation in the letter related to facts unquestionably within the knowledge of the author. Moreover, the letter was timed so that the Company could not make an effective answer. The findings of the Regional Director in the case at bar, adopted by the Board, state: "It is also found that there is no requirement that the distribution of campaign propaganda be timed so that the other party will have an opportunity to answer it." This statement offends the court's sense of fair campaigning. In N.L.R.B. v. Houston Chronicle Publishing Company, 5 Cir. 1962, 300 F.2d 273, a union letter was circulated two days before the election. It contained misstatements. The employer sought to answer by telegram. The Board held that this was a sufficient answer. This Court disagreed and denied enforcement of the Order, pointing out that the Board was not following its own standards:

However, when a party deliberately makes material misrepresentations of fact in circumstances in which employees are unable to evaluate the truth or falsity of the assertions, the Board has held that the legitimate bounds of campaign propaganda have been exceeded and has set aside the election. 300 F.2d at 278.

In N.L.R.B. v. Bata Shoe Company, 4 Cir. 1967, 377 F.2d 821, 831, the Court, apparently without any evidence that any voter was actually misled, held that misrepresentations as to the content of "New York union contracts" being made without adequate time for answer, where as few as three votes can alter the election result, "constitute an interference with employee free choice."

In sum, undisputed facts in the record require the Court to hold that the Board should have reached a conclusion diametrically opposite to the conclusion it reached.

On the petition for review the order of the Board is set aside. The Board's cross-application for enforcement is denied.