**The CONTRACT KNITTER, INC.,**
**Petitioner-Cross Respondent,**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent-Cross**
**Petitioner.**

**No. 76–1832**
**Summary Calendar.***

United States Court of Appeals,
Fifth Circuit.

Jan. 20, 1977.

Rehearing Denied March 28, 1977.

---

* Rule 18, 5 Cir.; see *Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York, et al.,* 5 Cir., 1970, 431 F.2d 409, Part I.

Bradley R. Johnson, Bruce A. Petesch, Frederick C. Heidgerd, John G. Creech, Greenville, S. C., for Contract Knitter, Inc.

Elliott Moore, Deputy Assoc. Gen. Counsel, Aileen Armstrong, Supervisor, Ruth E. Peters, Atty., Washington, D. C., for the N.L.R.B.

Before BROWN, Chief Judge, and GEWIN and MORGAN, Circuit Judges.

JOHN R. BROWN, Chief Judge:

The Contract Knitter, Inc. (Employer) petitions for review of an order of the Board finding that the Employer violated §§ 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C.A. §§ 158(a)(5) and 158(a)(1), by refusing to bargain with the duly certified union representing the employees of Employer.[1] The Employer also petitions for review of that portion of the Board's order ordering the Employer to cease and desist from refusing to bargain with the Union and to cease and desist from interfering with the § 7 (29 U.S.C.A. § 157) rights of the Voting Employees. The Board has cross-petitioned for enforcement of its orders. We deny Employer's petition and grant the Board's cross-petition.

1. For ease of identification, we refer to the employees of the Employer as the Voting Employees.

On November 27, 1973, the Union filed a representation petition with the Board, seeking certification as the collective bargaining representative of the Voting Employees. Pursuant to a Stipulation for Certification upon Consent Election, an election was scheduled for January 23 and 24, 1974.

Three days before the election, the Union mailed certain literature to the Voting Employees over the Union's official signature. This mailing was composed of a cover sheet with four pages of photocopies of payroll check stubs of Union members who were employees[2] of a neighboring knitting mill. The cover sheet read, "We do the same kind of work, but what a difference in pay. COMPARE THE ENCLOSED CHECK STUBS."

The election was held as scheduled, by secret ballot. Of approximately 280 eligible voters, 145 cast votes for the Union while 124 cast their votes against the Union.

On January 29, 1974, the Employer filed timely objections to the election. On May 24, 1974, the Regional Director conducted an *ex parte* investigation and recommended that most of the Employer's objections be overruled. However, he recommended that Objection 7 be sustained, the election be set aside and a second election be directed.

Objection 7 stated:

"The Union's representative and/or agents engaged in material misrepresentations which were stated or issued at a time and in such circumstances that the Employer had no adequate opportunity to effectively reply."

The Regional Director concluded, after his examination, that

"it cannot be said for certain that *all* employees possessed independent knowledge of the other three plants' operations with which they could effectively evaluate the Union's literature."

"The statement, 'We do the same kind of work, but what a difference in pay' is not accurate since 12 of the 16 [Union Employees] hold jobs that are quite different from the jobs held by Contract Knitter employees. Without job classifications listed, the Contract Knitter employees receiving the literature may have assumed that the rates received by the 10 [Union Employees] were for work similar to the work, they, Contract Knitter employees, were doing whereas, the fact is that the listed [Union Employees] were doing entirely different work; sobar operators, sewing machine operators and trim and turn work. No such jobs existed at Contract Knitter. In addition, the [Union Employees] are . . . on a piecework system, not a straight time system as are Contract Knitter employees."

App., at 19.

Rather than accept the Regional Director's recommendations outright, the Board ordered a Hearing to resolve the issues left open by the Regional Director's recommendations.

The Hearing was conducted before a Hearing Officer on October 8, 9, 10, 29, 30 and 31, 1974. During this extensive hearing, thirty witnesses testified, resulting in a record comprising 1,020 pages and approximately 300 exhibits. The evidence disclosed that, in fact, some of the Union Employees whose pay check stubs were included in the literature did not do the same kind of work the Voting Employees did. Furthermore, most of the check stubs from the Union Employees were presented as if they were paid at an hourly rate (as were the Voting Employees), when in fact they were paid at a piecework rate.[3] The overall effect of both of these misrepresentations was probably to overstate the pay difference between the Union Employees and the Voting Employees to some extent. On the other hand, it is undisputed that the Union Employees did earn somewhat more than the Voting Employees, no matter what method of comparison was used.

---

2. For ease of identification, we refer to the employees of the neighboring mills as the Union Employees.

3. Boldface print above each check emphasized this "hourly" rate for each Union Employee.

The evidence also disclosed that, at several meetings, Union Organizers spoke to the Voting Employees[4] about the contracts held by the Union Employees, pointing out the wages and other benefits provided by the Contract. During these discussions, copies of the contract were passed around to the voting employees and the employees were shown how to locate the wage scale applicable to their job classification. Some employees received copies to show their fellow employees and for their personal use. Union organizers and adherents also visited approximately 50 employees' homes and there showed and explained the same agreement, including the wage scale. Union organizers and adherents also stood on the side of the road during shift changes and discussed and explained the Union Employees' contracts with the Voting Employees.

From this evidence, the Hearing Officer concluded that "the evidence establishes that most, if not all, employees who were willing to speak to the ILGWU organizers or adherents, had the opportunity to examine the [Union] contract." App., at 39.

The evidence also discloses that "The Employer moved swiftly to counteract the Union's organizational campaign during this period by sending seven letters or notices to all of its employees . . .. Coupled with these communications was the creation of an employee-grievance committee during October 1973 . . ., the issuance of a fake check to each employee in January 1974, representing the ILGWU dues deduction . . ., and an open house for all employees and their families on January 19, 1974, complete with refreshments, prizes and a clown act." App., at 39.

The Hearing Officer recommended that Objection 7 be dismissed and that the certification of representation be issued. In reaching this conclusion, the Hearing Officer stated that the crux of the issue was whether the alleged misrepresentation involved a substantial departure from the truth, and, if so, whether it created a tendency materially to mislead the Employees.

After noting that the burden was on the Employer to prove these factors, the Hearing Officer concluded that these questions must be answered in the negative.

The Hearing Officer found that the literature was merely inartistically or vaguely worded and that this was not sufficient to establish a misrepresentation sufficient to justify setting aside an election. He further found that the Voting Employees were in fact not misled. All of the witnesses, including the Employer's own witnesses, showed knowledge of facts by which they knew, or should have known, that the workers in the Unionized plants performed different work. The Hearing Officer finally found that the Employer had failed to prove that the literature had any actual impact on the Voting Employees' election choice.

The Board, upon consideration of the Hearing Officer's report, issued a decision in which it found that the literature mailed by the Union "did not involve a substantial departure from the truth which could reasonably be expected to have had a significant impact on the election." In reaching this conclusion, the Board found that the work performed by some of the Union Employees was substantially similar to the work performed by the Voting Employees. The Board found that the check stubs of the remaining Union Employees had no real impact on the election because (i) the Union and its representatives had passed around copies of the Union Employees' contract and had discussed and explained the wage classifications, (ii) the check stubs all had a box marked "piece wk." on them which indicated the Union Employees' piece work wages and (iii) the Voting Employees were aware in fact that the Union Employees performed different work. Relying on these factors, the Board held that the Union "has not exceeded the bounds of fair electioneering and has not interfered with the free choice of the employees."

After the Board's decision, the Union was certified, but the Employer refused to bar-

4. Approximately 100 or more Voting Employees attended one or more of these meetings.

gain with the Union in order to test certification. Charges were filed against the Employer which the Board resolved in favor of the Union on a motion for summary judgment. The Board thereupon directed the Employer to bargain with the Union, and this appeal followed.

 Neither the Board nor the courts will censor or police campaign propaganda unless the misrepresentations are so substantial that the uncoerced desires of the employees cannot be determined. The test is whether the misrepresentation can reasonably be expected to have had a significant effect on the election. *Linn v. United Plant Guard Workers*, 1966, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582; *NLRB v. Muscogee Lumber Co.*, 5 Cir., 1973, 473 F.2d 1364, 1366–67; *S. H. Lynch & Co. v. NLRB*, 5 Cir., 1968, 406 F.2d 766; *Anchor Manufacturing Co. v. NLRB*, 5 Cir., 1962, 300 F.2d 301. In making this determination, the familiar four-pronged test is used: (i) whether there has been a misrepresentation of a material fact, (ii) whether the misrepresentation came from a party in an authoritative position to know the truth, or who had special knowledge of the facts, (iii) whether the other party in the election had adequate opportunity to reply and to correct the misrepresentation, and (iv) whether the employees had independent knowledge of the misrepresented fact so that they could effectively evaluate the propaganda. *Hollywood Ceramics, Co.*, 1962, 140 N.L.R.B. 221; *NLRB v. Mr. Fine, Inc.*, 5 Cir., 1975, 516 F.2d 60; *NLRB v. Southern Foods, Inc.*, 5 Cir., 1970, 434 F.2d 717; *S. H. Kress & Co. v. NLRB*, 5 Cir., 1970, 430 F.2d 1234.

 In addition to these specific principles governing campaign propaganda, there are also the general principles that the Board has been vested with wide discretion in representation matters and that its decision warrants special respect by reviewing courts. *NLRB v. A. J. Tower Co.*, 1946, 329 U.S. 324, 67 S.Ct. 324, 91 L.Ed. 322; *NLRB v. Muscogee Lumber Co.*, supra, at 1366. Our task is limited to a determination of the reasonableness of the Board's findings. *NLRB v. Muscogee Lumber Co.*, supra, at

1366; *NLRB v. Golden Age Beverage Co.*, 5 Cir., 1969, 415 F.2d 26. In making this determination, the burden is on the employer to demonstrate that the election was not fairly conducted. *NLRB v. Muscogee Lumber Co.*, supra, at 1366. The "presumption is that ballots cast under the safeguards provided by board procedure reflect the true desires of the participating employees." *NLRB v. Zelrich Co.*, 5 Cir., 1965, 344 F.2d 1011, 1015.

There are, finally, two principles which are potentially very important in this case. First, the cases place a higher standard of precision on Union statements regarding wages, since wages "are the stuff of life for Unions and members, the selfsame subjects concerning which men organize and elect their representatives." *NLRB v. Houston Chronicle Publishing Co.*, 5 Cir., 1962, 300 F.2d 273, 280. Thus, claims "involving wages and benefits based upon unstated hypotheses constitute a *prima facie* misrepresentation." *NLRB v. Mr. Fine, Inc.*, supra, at 63; *NLRB v. Bill's Institutional Commissary Corp.*, 5 Cir., 1969, 418 F.2d 405, 407. The second principle is that, in "close vote election situations the Board is required to particularly and carefully scrutinize charges which in other cases would constitute immaterial or insubstantial objections to the election . . . ." *NLRB v. Gooch Packing Co.*, 5 Cir., 1971, 457 F.2d 361, 362. *See also United Steelworkers of America, AFL–CIO v. NLRB*, 5 Cir., 1974, 496 F.2d 1342; *Walled Lake Door Co. v. NLRB*, 5 Cir., 1973, 472 F.2d 1010; *NLRB v. Overland Hauling, Inc.*, 5 Cir., 1972, 461 F.2d 944.

 Our careful review of the record below convinces us that the Board acted reasonably and within the wide discretion we have accorded it in representation proceedings when it determined that the literature mailed by the Union did not involve a substantial departure from the truth which could reasonably be expected to have had a significant impact on the election. In reaching this conclusion we are not unmindful of the principles applicable in close elections in which misrepresentations concern-

ing wages have been made. However, in this case, the Board, through a Hearing Officer, conducted an exhaustive hearing before reaching a decision which showed substantial support in the record developed during that hearing. In particular, the testimony given during that hearing by all of the employee witnesses—including those witnesses of the Employer—gives clear support to the Hearing Officer's and Board's conclusion that the literature had no *actual impact* on the Voting Employees' free choice in the election. Under these circumstances, we conclude that the Board's order was a reasonable one which we should enforce.

Accordingly, we deny the Employer's motion to set aside the Board's order and we grant enforcement of the Board's order to compel the Employer to bargain with this duly certified Union.

PETITION DENIED, ORDER ENFORCED.