**VITEK ELECTRONICS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 80–1867.

United States Court of Appeals, Third Circuit.

Argued Jan. 15, 1981.

Decided June 30, 1981.

As Amended July 20, 1981.

---

A. Leon Higginbotham, Jr., Circuit Judge, filed a dissenting opinion.

B. Michael Thrope (argued), Parker Chapin Flattau & Klimpl, New York City, for petitioner; John E. Jay, Jeffrey S. Donin, New York City, of counsel.

Andrew F. Tranovich (argued), Mendelssohn V. McLena, N. L. R. B., Washington, D. C., for respondent; William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., of counsel.

Before ROSENN and HIGGINBOTHAM, Circuit Judges, and McCUNE, District Judge.*

\* Honorable Barron P. McCune, United States District Judge for the Western District of Penn-

## OPINION OF THE COURT
ROSENN, Circuit Judge.

This petition for review and cross-application for enforcement of an order of the National Labor Relations Board presents a number of issues concerning the propriety of union conduct preceding a representation election. On April 5, 1979, the International Union of Electrical, Radio and Machine Workers (the IUE or Union) filed a petition with the National Labor Relations Board (the Board) for a representation election at the Edison, New Jersey, plant of Vitek Electronics, Inc. The election, involving a bargaining unit of 120 employees previously not represented by a union, was held June 7, 1979. The Union won, 70 to 45. Vitek filed eight objections with the Board's Regional Director (the "RD"). After an administrative investigation that included ex parte interviews with potential Vitek witnesses, but no hearing, the RD recommended that Vitek's objections be overruled. Vitek filed exceptions with the Board, but the Board, also without a hearing, adopted the RD's findings and recommendations.

Vitek, as a method of challenging the election, subsequently refused to bargain with the Union. On February 4, 1980, the General Counsel issued a complaint alleging violation of section 8(a)(1) & (5) of the National Labor Relations Act. 29 U.S.C. § 158(a)(1) & (5) (1976). The Board entered summary judgment in favor of the General Counsel because the only issues raised by Vitek were essentially already litigated and lost by Vitek in the underlying representation case. Vitek filed this petition for review of the Board's subsequent order; the Board has cross-applied for enforcement. 29 U.S.C. § 160(e) & (f) (1976).

■ Our review is essentially a review of the Regional Director's post-election findings and conclusions as adopted by the Board. See Pittsburgh Plate Glass Co. v. NLRB, 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed.

sylvania, sitting by designation.

1251 (1941); *Anchor Inns, Inc. v. NLRB,* 644 F.2d 292, 293 (3d Cir. 1981). In his report the RD dealt with Vitek's eight objections in four groups. On its petition to this court Vitek attacks the findings and conclusions with respect to two of these groups of objections—one alleging union intimidation and another alleging union misrepresentation in campaign literature. We conclude that Vitek's objections to the Union's alleged misrepresentations, as presented to the RD, disclosed "substantial and material factual issues" that required the RD or the Board to conduct an evidentiary hearing prior to certification of the election results. We grant the petition for review and deny enforcement.

## I.

According to Vitek's initial submission to the RD, "[o]n the day of the election itself, and possibly on . . . the day prior to the election, the Union distributed to employees" two "handbills" (among others) whose contents were allegedly false. One was titled "IUE-Vitek News" (the "News" handbill) dated June 4, 1979. Its front page declared that although

> [l]atest figures issued by the government indicate that the cost of living is going up at a rate of 14% . . . the Vitek Company provides no cost of living protection for its workers, another reason why we need a union at Vitek.
>
> In other plants in this area, where the people have previously voted in the IUE, the Union has negotiated cost of living protective clauses.
>
> Under their union contract
>
> * AT EDISON PRODUCTS (WHITE–WESTINGHOUSE), EDISON, N.J.
> * AT GULTON INDUSTRIES, METUCHEN, N.J.
> * AT DELCO BATTERY, NEW BRUNSWICK, N.J.

> the wages of IUE members are increased regularly, throughout the year, to keep pace with the cost of living increase announced by the U.S. Department of Labor.
>
> This is the kind of protection we need at Vitek where wages are low enough without being further "cut" by runaway prices.

(Emphasis added.)

Vitek asserted that the IUE contracts at Edison Products, Gulton Industries, and Delco Battery did "not guarantee to employees absolute and unlimited protection against cost of living increases, as stated in the Union leaflet. Rather those cost of living formulas are 'capped' and keyed to a specific formula."

Another handbill was entitled "A Story By and For Vitek Workers" (the "Story" handbill). "Chapter One" of this story told the following unhappy tale:

> In the "good ole" days, before the union came on the scene, the company had every opportunity to make Vitek a decent place to work.
>
> But they goofed. *Rates of pay were the lowest in the area.* Seniority meant nothing when it came to promotions or overtime.
>
> Few safety precautions were taken to protect the people from carbon monoxide fumes, and when they got sick because of the fumes, many of the workers lost pay.
>
> Employees could be fired with no chance of appeal and all in all, management was completely in the driver's seat.

(Emphasis added.)

Vitek contended that these statements were "completely false and misleading. For example, Vitek's rates of pay are among the highest in the area for similar work."[1] As to both handbills, moreover, Vitek claimed that the timing of the distribution effectively precluded Vitek from

---

1. Vitek made and supported objections to other alleged misrepresentations in the "Story" handbill. Its petition in this court preserves these same objections. In view of our conclusion that a hearing was warranted by at least one misrepresentation in this handbill, we do not find it necessary to discuss in detail all of Vitek's additional arguments based on this handbill. *But see* note 10 *infra.* Upon remand Vitek will have the opportunity to show, in the course of a hearing, all of the prejudicial effects flowing from it.

having "an adequate opportunity to obtain the necessary information and to prepare and distribute an appropriate response to these misrepresentations."

On June 27, 1979, Vitek's president, Robert G. Geissler, submitted an affidavit to the RD in support of Vitek's objections. He detailed the circumstances making impossible effective rebuttal of the Union's misrepresentations. He also explained why the Union handbills were, in his view, false and misleading. He noted that a Board agent had been provided with copies of the collective bargaining agreements between the IUE and Edison, Gulton, and Delco. Geissler also provided a comparison of Vitek's wages (both before and after April 15, 1979) and current wages at ten other area employers for allegedly comparable "unskilled" work. This comparison showed that of the eleven companies, Vitek's wages had been not the lowest but the highest, both before and after April 15, 1979.

Apparently in response to the Board agent's request for further information, Vitek submitted additional information in support of its objections, including a list of its various pay scales in effect from January 2, 1976 (the date on which "Vitek started hiring its own employees") through April 14, 1979. This list confirmed Geissler's earlier assertion, and showed that Vitek's wages had, since at least October 24, 1977 (and not, as suggested by the dissent, only since April 15, 1979), exceeded those of ten local labor-market competitors.

Finally, on August 31, Vitek submitted detailed calculations of the precise extent to which the Union's "News" handbill had misrepresented its cost of living agreements at Edison, Gulton and Delco.

In his report, adopted by the Board, the Regional Director overruled all of Vitek's objections and recommended that the Union be certified. Regarding the Union's "Sto-

ry" handbill, the RD held that "in the 'good ole' days, before the Union came on the scene" referred to "some unspecified period of time in the past."[2] On the other hand, the evidence marshalled by Vitek to counter the assertions concerning relative wage rates related only to wages that took effect as of October 24, 1977. Thus, the RD found that there was "no evidence . . . submitted to support the Employer's assertion that the Petitioner's contention concerning wages was a material misrepresentation of fact." Further, the RD found that even if this was a misrepresentation, Vitek had (a) "prompted" it by its April 2 announcement to employees that it was conducting a "study of area wages," and (b) deliberately chosen to let it remain uncontested. Regarding the "News" handbill, relating to cost of living adjustment (COLA) clauses, it was "undisputed that Petitioner [i. e., the Union] does in fact have cost of living protective clauses which are designed to keep pace with increases in the cost of living albeit not at the actual rate of increase in the cost of living." Thus, the RD found that the handbill was not a "substantial departure from the truth." For these reasons, among others, the representations were held to be immaterial to the validity of the election.

## II.

We begin by noting what was, perhaps, too obvious for the RD to mention in his report. Both of the handbills at issue here contained representations as to which Vitek raised at least a genuine issue concerning their falsity. Vitek's president stated by sworn affidavit that Vitek's pre-April 15, 1979 wage scale exceeded those of ten local competitors. Vitek further documented its claim that this same wage scale had existed since October 1977, well before the Union had "come on the scene" to engage in the current organization effort.[3] Thus, Vitek

2. In any event, the period must have pre-dated April 5, 1979, the date on which the Union petitioned for an election.

3. In fact, Vitek submitted evidence of its own wage scales for a period extending back to January 1976. Given the rate of inflation in the economy as a whole, and given the size of Vitek's wage rate increase in 1977, there was good reason to believe that Vitek's competitors, whose 1979 wage rates fell below Vitek's 1979 rates, similarly lagged behind Vitek in 1976 and 1977.

did submit "comparative data ... concerning ... competitors' wage structures" that, if true, seemed to negate the truth of the Union's claim that Vitek's wages were "the lowest in the area." Secondly, it is apparent from the face of the Union's "News" handbill that in it the Union seemed to claim that its contracts at other plants insulated workers from the adversities of inflation. And Vitek clearly presented ample evidence to show that in fact those contracts fell short of such absolute protection by unquestionably substantial amounts: between 33 and 89 cents per hour, averaging 61 cents per hour.

Significantly, the RD never went so far as to find that the Union's statements were more than "arguably true." We agree. The other side of the coin, of course, is that he was implicitly saying that they were at least "arguably untrue." And Vitek's objections and supporting materials were sufficiently specific to raise a prima facie case of inaccuracy.

■ However, in assessing campaign rhetoric, "the Board tolerates a degree of hyperbole, intemperance and inaccuracy." *Aircraft Radio Corp. v. NLRB*, 519 F.2d 590, 593 (3d Cir. 1975). Thus, while we objectively raise the arguable falsity implicit in the "arguable" truth attributed by the RD to the Union's literature, this issue does not in itself afford us adequate ground for granting Vitek's petition. An election will only be set aside when there has been a substantial departure from the truth that "may reasonably be expected to have a significant impact on the election." *General Knit of California, Inc.*, 239 N.L.R.B. 619, 620 (1978).

■ Nor do we conclude on the basis of inaccuracy alone that Vitek's objections raised the "substantial and *material* factual issues" necessary to entitle it to a hearing under 29 C.F.R. § 102.69(d) (1980). In numerous decisions since *Hollywood Ceramics Co.*, 140 N.L.R.B. 221 (1962), the Board and the courts have recognized many elements that render a misrepresentation "immaterial" in this sense. Thus, the force of a misrepresentation may be substantially diluted when the employees possess special independent knowledge or sophistication which enables them to evaluate the statements critically;[4] where the employees had no reason to believe that the author of certain verbal denigrations had any special knowledge on which they could rely;[5] where the employer had an adequate opportunity to set the record straight;[6] or where the inaccuracy is itself too minor or insignificant to affect the voters' choice, *i. e.*, is not a "substantial departure from the truth." *Hollywood Ceramics Co.*, 140 N.L.R.B. at 224.

■ Although this brief catalog is not complete, it necessarily informs us that factual determinations must enter into the decision whether the misrepresentations here warranted setting aside this election. See *NLRB v. Bill's Institutional Commissary Corp.*, 418 F.2d 405, 407 (5th Cir. 1969). Taking into account the proffer submitted by Vitek to support its post-election objections, we are persuaded that the grounds upon which the RD recommended certification could not adequately be developed without an evidentiary hearing. Of course, in reaching this conclusion that Vitek's ob-

---

4. *Trustees of Boston Univ. v. NLRB*, 575 F.2d 301, 308–09 (1st Cir. 1978), *vacated on other grounds*, 445 U.S. 912, 100 S.Ct. 1271, 63 L.Ed.2d 597 (1980); *NLRB v. O.S. Walker Co.*, 469 F.2d 813 (1st Cir. 1972); *cf. NLRB v. Maine Sugar Indus., Inc.*, 425 F.2d 942, 945 (1st Cir. 1970) (distinguishing between workers with and without a "union background").

5. *Melrose-Wakefield Hosp. Ass'n v. NLRB*, 615 F.2d 563, 568 (1st Cir. 1980); *NLRB v. O.S. Walker Co.*, 469 F.2d 813 (1st Cir. 1972).

6. *Lipman Motors, Inc. v. NLRB*, 451 F.2d 823 (2d Cir. 1971); *NLRB v. Bata Shoe Co.*, 377 F.2d 821, 828–29 (4th Cir.), *cert. denied*, 389 U.S. 917, 88 S.Ct. 238, 19 L.Ed.2d 265 (1967). *But see Aircraft Radio Corp. v. NLRB*, 519 F.2d at 593 ("Fairness is not readily apparent when a party which has been successful in the balloting through the use of deliberate falsehood is allowed to retain its victory by pleading that its opponent had opportunity for rebuttal."); *NLRB v. Cactus Drilling Corp.*, 455 F.2d 871, 876 (5th Cir. 1972) (distinguishing rebuttal from opportunity to rebut).

jections entitled it to a hearing, our inquiry necessarily touches upon areas committed in some degree to the Board's discretion.[7] However, the ultimate question that we reach and decide today—whether Vitek has raised substantial and material factual issues—"is a question of law and ultimately a question for the courts." *NLRB v. Bata Shoe Co.*, 377 F.2d 821, 826 (4th Cir.), *cert. denied*, 389 U.S. 917, 88 S.Ct. 238, 19 L.Ed.2d 265 (1967) (citing, *inter alia, NLRB v. Sun Drug Co.*, 359 F.2d 408, 415 (3d Cir. 1966) (denying a request for an evidentiary hearing on the issue "whether there was a substantial and material question of fact" because "[t]his is a question of law")); *accord, NLRB v. Polyflex M Co.*, 622 F.2d 128, 129 (5th Cir. 1980) (per curiam); *Methodist Home v. NLRB*, 596 F.2d 1173, 1179 (4th Cir. 1979); *NLRB v. Skelly Oil Co.*, 473 F.2d 1079, 1083 n.5 (8th Cir. 1973).

 Because the representations were purportedly truthful assertions concerning wages, they could not be dismissed as "mere prattle or puffery"; wages are the breath and "stuff of life for Unions and members, the self-same subjects concerning which men organize and elect representatives." *Peerless of America, Inc. v. NLRB*, 576 F.2d 119, 124 (7th Cir. 1978) (quoting *Contract Knitter, Inc. v. NLRB*, 545 F.2d 967, 971 (5th Cir. 1977)). The Union's claim that it was describing its own contracts with nearby employers, as well as general wage rates in its geographical area of operation, lent its misrepresentations an air of authenticity that likely carried significant weight in the minds of Vitek's employees. Moreover, the Union's apparent expertise in this field was not countered by independent knowledge that Vitek's previously nonunionized employees were likely to possess.

 Finally, the statements, insofar as they were (arguably) untrue, were hardly "insubstantial" departures from the truth. For instance, the Board does not dispute that IUE contract wages at Edison, Gulton, and Delco had, in the recent past, lost an average of 61 cents per hour to inflation. Thus IUE wages failed, by this amount, "to keep pace with" inflation, (arguably) contrary to the representation made in the "News" handbill. The realities of the marketplace render it indisputable that a 61 cent per hour misrepresentation of the wages obtained by the Union for workers in other bargaining units would have been a distortion of sufficient magnitude to exert an impermissible influence on the election results. *NLRB v. Millard Metal Service Center, Inc.*, 472 F.2d 647, 650 (1st Cir. 1973); *see also Howard Plating Industries v. NLRB*, 635 F.2d 532 (6th Cir. 1980) (per curiam); *Luminator Division of Gulton Industries, Inc. v. NLRB*, 469 F.2d 1371 (5th Cir. 1972).

The RD argued in his report that the interpretive premise of this objection was not "necessarily" correct. The "News" handbill did not, said the RD, literally assert the existence of COLA clauses to "guarantee to employees absolute and unlimited protection." In fact, the handbill stated that IUE member wages were "increased regularly . . . to keep pace with the cost of living increase announced by the U.S. Department of Labor." The RD noted that adjustments "to" keep pace with inflation were "quite different" than adjustments that "would" keep pace with, and therefore afford "absolute protection" against, inflation. He concluded that the handbill contained not a simple lie, but rather a statement "subject to varying interpretations."

For purposes of determining whether a genuine issue of fact existed as to the accuracy of the statement, we have difficulty, to say the least, appreciating this subtle distinction. We think such subtlety would be even less appreciated by employees in the heat of an election campaign. Furthermore, we find incomprehensible the RD's conclusion that "to keep pace with" and "would keep pace with" the cost of living were "quite different." If two workers

7. The scope of that discretion has, of course, been effectively narrowed over the years since *Hollywood Ceramics* was handed down, as this and other courts have gradually given factual content to the rather abstract pronouncements in the Board's seminal decision.

each start the year making $3.30 per hour but at the end of the year their wages differ by $.61 per hour, it satisfies neither common sense nor common English usage to assert that the wages of either have been adjusted "to keep pace with" the wages of the other. Even the Board's reputed expertise in labor matters[8] cannot prompt us to accept the RD's conclusory determination that Vitek's workers would be likely to interpret the phrase "to keep pace with" in such a way as to render the Union's handbill congruent with the truth.

As a result, we conclude that Vitek's objections and supporting material established a prima facie case for setting aside the election because of the content of the Union handbills. This, together with the apparent last-minute nature of the Union misrepresentations, entitled Vitek to a hearing on its objections. *Anchor Inns, Inc. v. NLRB*, 644 F.2d at 296; *see, e. g., Peerless of America, Inc. v. NLRB*, 576 F.2d 119 (7th Cir. 1976); *NLRB v. Mr. Fine, Inc.*, 516 F.2d 60 (5th Cir. 1975); *NLRB v. Bill's Institutional Commissary Corp.*, 418 F.2d 405 (5th Cir. 1969); *see also NLRB v. Staiman Brothers*, 466 F.2d 564, 567 (3d Cir. 1972) ("It is implicit in a Consent Election agreement that . . . any proceedings pursuant thereto will satisfy minimal due process standards."). The RD, however, looked to other facts which he believed made the alleged misrepresentations immaterial. According to his report,

> the investigation revealed that the Employer, by letter dated April 2, 1979, advised its employees that it was conducting a "study of area wages," and by letter dated April 17, 1979, announced its newly established wage rates. It therefore appears that . . . [the Union's] statement regarding wages . . . was prompted

by the actions of the Employer itself; and as the Employer had already conducted a study of area wages, it appears that it could have immediately and effectively responded to [the Union's] statement notwithstanding its statement to the contrary. . . . [T]he Employer, although admittedly aware of Petitioner's statement a full day before the election and having recently conducted a wage comparability study within the area, chose to let Petitioner's statement remain uncontested.

The Regional Director thus appears to have resolved factual issues bearing on materiality through consideration of material uncovered in an administrative investigation. But "[o]nce the right to a hearing is established, the investigation is not a substitute for it." *Anchor Inns, Inc. v. NLRB*, 644 F.2d at 297 (quoting *NLRB v. Claxton Manufacturing Co.*, 613 F.2d 1364, 1366 (5th Cir. 1980)). In this case the data submitted to the Board raised "substantial and material issues" regarding all of the necessary factual predicates for overturning the election, including Vitek's preclusion from timely offering a rebuttal to the Union's misrepresentations.[9] Yet the RD chose to resolve these issues not through a hearing but through an administrative investigation. Not only did this deprive Vitek of an opportunity to meet those arguments marshalled by the RD to negate materiality, but it also deprived this court and the Board of an adequate basis upon which to evaluate the validity of the process by which the RD arrived at his findings that the misrepresentations were immaterial.

Our reluctance to accept the RD's findings without the benefit of a record after hearing is compounded by the shallow basis upon which the RD overruled Vitek's objec-

---

8. *See Zeiglers Refuse Collectors, Inc. v. NLRB*, 639 F.2d 1000, 1010 (3d Cir. 1981); *cf. Peerless of America, Inc. v. NLRB*, 576 F.2d at 122 n.3 ("scholarly criticism for more than a decade has questioned that expertise").

9. President Geissler averred in his affidavit that I was unable to present this information to our employees before they voted because the Union made its allegations concerning our

pay rates on the very last day and it was impossible to assemble the information on "Exhibit 3" [the list of ten area competitors with wage rates lower than Vitek] prior to the vote. In fact, it has taken my staff more than two (2) weeks to assemble the information on "Exhibit 3", since many companies are naturally reluctant to reveal their wage rates to outsiders.

tions. He seems to have held that (a) the Union's misrepresentation of past area wage rates was pardonable because it was "prompted" by Vitek's announcement of a current "study of area wages," and (b) Vitek's announcement of a wage study dispelled any genuine factual issue concerning its ability to respond to the Union's misrepresentation in the one available day preceding the election.

■ We fail to perceive how Vitek's April 2 announcement of a wage study provided justification for Union misrepresentation of area wages that prevailed in "the 'good ole' days." Vitek's announcement did not make factual claims that the Union was forced to rebut. Had that occurred, we might take into account whether the Union was time-pressured into an erroneous rebuttal based upon tentative conclusions. We express no opinion whether under such a hypothetical set of facts, this court would also "excuse" plain misrepresentations. However, the record of this case discloses no substantial evidence upon which to predicate such a holding. The Union's alleged misrepresentation was published over two months following Vitek's announced study. More centrally, the Union misrepresentation referred to past wage rates, while Vitek's study was aimed at current rates. In addition, the RD relied on nothing but sheer supposition in assuming that, prior to the election, Vitek possessed sufficient data to rebut the wage claims. The RD did not indicate whether a formal study was actually made, or if so, how it was conducted, or what it revealed. We can understand how the mere announcement of a planned study might enter into a credibility determination on the issue of ability to rebut. We cannot, however, understand how the making of such an announcement can be used by the RD to deprive Vitek of the forum to which it would be otherwise entitled (*viz.*, an evidentiary hearing) in which to resolve the rebuttal issue.

We similarly reject the RD's resolution of the COLA issue on the ground that it involved no "substantial departure from the truth." In concluding that the Union's "News" handbill was subject to "varying interpretations," the RD drew his ultimate distinction between truth and falsity by resort to a specious semantic distinction. As a result, we do not believe that he could properly determine on the basis of his investigation that, as a factual matter, the audience to which it was addressed would adopt an interpretation other than Vitek's. In view of the significance of the alleged discrepancy and our own skepticism that the item would be interpreted as other than a misrepresentation, we conclude that the RD should not have reached his decision without first affording Vitek a hearing in which to challenge the RD's assumption that the handbill would be interpreted by its intended audience consistently with the truth of the underlying facts.[10]

---

10. The RD also found, in connection with the "Story" handbill, that there was "no evidence . . . submitted by the Employer that it had a seniority job-posting program or grievance procedure prior to April 2, 1979." Also the Union's assertion relating to lost pay from sickness due to carbon monoxide fumes was found by the RD to be, in part, corroborated. Nor was the RD troubled by the assertion that "[F]ew safety precautions were taken," since "no evidence was offered to show which steps were taken. Accordingly, I again find Petitioner's statement arguably true, and if steps were in fact taken to improve ventilation, employees would have been aware of these actions and, therefore, fully capable of evaluating Petitioner's statement."

We are not impressed by the harmlessness of the Union's allegations about carbon monoxide fumes and lost pay. Although the Union claims in this case do not match the invidiousness or the falseness of the claim in *NLRB v. Trancoa Chem. Corp.*, 303 F.2d 456 (1st Cir. 1962), or portray "spiteful, inhuman treatment" as in *Ipsen Indus. Div. of Alcoa Standard Corp.*, 180 N.L.R.B. 412 (1969), we cannot be blind to the significant impact in the context of this campaign that the Union's fume-related literature may have had. It conveyed the impression that the factory was generally unsafe, that Vitek callously put workers to the rather barbaric choice between ruining their health or earning their pay, and that it was the appearance of the Union "on the scene" that had created the present, more healthful climate at the Vitek plant.

However, Vitek submitted evidence that the fume problems were a transitory, short-term problem related to Vitek's February 1979 move and that the problem arose and was resolved in

## III.

Vitek has also argued here and below that it was entitled to a hearing on the question of whether the Union poisoned the pre-election atmosphere by intimidation. Vitek argues that a hearing is necessary because it needs compulsory process to compel testimony in its favor that would otherwise remain silenced by the thoroughness of the Union's intimidation.

Unfortunately, there is no adequate record here from which to tell whether the RD correctly determined that no hearing was necessary. When Vitek presented the RD with its allegations of intimidation, supported by nine affidavits specifying numerous "specific events concerning specific people," *NLRB v. Dobbs House, Inc.*, 613 F.2d 1254, 1259 (5th Cir. 1980), the RD concluded that three of the affidavits, even if true, set forth legally permissible behavior. He explained his legal conclusions at length. Next, the RD distinguished seven employees named in the other affidavits whose "suggested evidence ... if supported by these witnesses themselves, would set forth arguable objectionable conduct." Yet the RD did not identify which employees, or which incidents, were cause for concern. A Board agent interviewed the (unnamed) witnesses. Their interviews apparently did not corroborate the arguably objectionable conduct set forth in the affidavits. The RD declined to interview six of the employees named in the affidavits because the evidence proffered concerning their testimony did not even arguably constitute objectionable conduct. Again, the RD did not explain which six employees or incidents he found useless to his inquiry.[11]

As a result, we cannot tell whether Vitek's affidavits did or did not, in the RD's view, set forth "substantial and material issues of fact." Nor, in view of the uncertainty of the substantive legal questions raised by the affidavits and the importance of the right to a hearing, will we decide the question on our own de novo review of the affidavits without benefit of the RD's own articulated views on the subject. The Board argues that the RD, like a trial judge on motion for summary judgment, is entitled to ignore issues of fact that are raised by affidavits not setting "forth such facts as would be admissible in evidence." Fed. R.Civ.P. 56(e). Because most of the legally objectionable incidents are allegedly set forth by way of hearsay, the Board now argues that the RD was entitled to ignore those incidents for purposes of deciding whether there was a substantial and material issue of fact. This contention deserves little credence on this appeal for at least three reasons. First, the RD did not draw any distinction between hearsay and nonhearsay evidence of objectionable conduct, and it is impossible for us to assume, on this record, that this was the sole or dispositive basis for his decision not to hold a hearing.[12]

---

a matter of weeks after the move. Moreover, its evidence tended to show that the only workers who lost pay due to claimed illness were those for whom Vitek had no reason to believe that it or its heating gas system were to blame. Thus the implication in the handbill, namely that Vitek improved its treatment of employees only after "the Union came on the scene," may well have amounted to a significant distortion of the truth.

11. Vitek has asked this court to require that the RD submit the results of its ex parte investigation to the Board for its review. *See generally NLRB v. North Elec. Co.*, 644 F.2d 580 (6th Cir. 1981). Because Vitek's request could affect only the Board's decision on the *merits* of the intimidation claim, and because we are unable to dispose of the threshold issue, *viz.*, whether or not absence of a hearing on this claim was justified, it will be unnecessary for us to confront Vitek's request at this time. We therefore find it unnecessary to grant Vitek's motion in this court to amend the record on review for the purpose of informing us as to the RD's failure to submit particular documents to the Board.

12. *See, e. g., NLRB v. Metropolitan Life Ins. Co.*, 380 U.S. 438, 444, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965); *Monmouth Medical Ctr. v. NLRB*, 604 F.2d 820, 823 n.5 (3d Cir. 1979).

We cannot help but notice that the RD's inability to believe the content of the supervisors' affidavits may indeed have played a large role in his failure to overturn the election. Thus for all that this record shows, the RD may have impermissibly used the administrative investigation to resolve an issue of credibility that could only be properly resolved after a hearing.

Second, Rule 56(e) does not apply here, but even if it did, and even if the evidence relating to the legally objectionable incidents was solely hearsay, it might still be admissible in evidence in the requested hearing.[13] Finally, it is undisputed that at least some of the narrations in the supervisors' affidavits were not hearsay for all purposes. We find it inappropriate at this time to engage in a de novo determination of what those purposes might be and whether or not they would actually warrant the RD in refusing to admit them at hearing. The RD may set forth his reasons for so finding, should he choose to once again deny Vitek a hearing on the intimidation issue.

## IV.

The case will be remanded with direction to the Regional Director to conduct a hearing on the issues of the alleged misrepresentation and for appropriate findings on the need for any further requested hearings prior to any recommendation to certify the results of the election.

Costs taxed against the Board.

A. LEON HIGGINBOTHAM, Jr., Circuit Judge, dissenting.

## I.

This case presents the question whether the National Labor Relations Board (the Board) erred in certifying the International Union of Electrical, Radio and Machine Workers, AFL–CIO (the Union) after an election campaign in which it was alleged that the Union misrepresented material facts and intimidated employees.[1] Vitek Electronics, Inc. (Vitek) argues that it did not have adequate time to respond to the Union's misrepresentations and that certain threats made by the Union and its agents against Vitek employees necessitated a

hearing before the Regional Director (RD) to determine if the "laboratory conditions" of the election were so polluted as to require the setting aside of the Union's 70 to 45 victory.

The majority concludes that the RD and the Board erred by failing to grant Vitek a hearing. Thus, it ordered the Board to set aside the Union's 25 vote majority and to conduct a hearing on Vitek's objections. I have concluded that the Board could find that the Union's statements were within the permissible range of campaign rhetoric and that Vitek failed to meet its burden of establishing the need for a hearing on the intimidation issue. While I am not suggesting that it would have been impermissible for the Board to have ordered a new election or to have had further hearings on Vitek's complaints, I would hold that the Board was *not required* to order a new election and was *not required* to have any further hearings.

Whether one is considering elections on the national political scene or in the context of labor relations, it would be ideal if all the parties spoke the truth, the whole truth and nothing but the truth. It would be preferable that every statement given be precisely accurate and in no way misleading. But, reality tells us that such idyllic standards do not exist among vigorous adversaries who have much at stake riding on the outcome of an election. In any event, from media advertisements for consumer products, to extravagant promises made by political candidates, Americans are used to exaggerations, overstatements and distortions. And, as a consequence, working men and women are not so gullible that they necessarily believe that every statement uttered in election campaigns is precisely accurate. As Abraham Lincoln once wrote, "you can't fool all of the people all the time."

**13.** Subject to certain exceptions not relevant here, "[a]ny hearing" before the regional director on objections to the conduct of an election "shall be conducted in accordance with the provisions of ... [29 C.F.R. §] 102.66 ...." 29 C.F.R. § 102.69(e) (1980). Section 102.66(a) provides that "[t]he rules of evidence prevailing

in courts of law and equity shall not be controlling."

**1.** The alleged misrepresentations concerned cost-of-living clauses, wages, job safety, seniority and job security.

Congress has delegated to the Board the power to determine (1) whether a particular misstatement is sufficiently material so as to fool or mislead employees unfairly at the polling place and (2) whether another election, where hyperbole is reduced, is required. In all due respect, the majority opinion reflects what I believe to be a failure in this circuit clearly to differentiate or appreciate the limited role of appellate review in National Labor Relations Board cases. Simply stated, it is for the Board to gauge the effect of campaign polemic. We are not empowered to sit as a super-board to try *de novo* what are essentially findings of fact. In short, the majority decision steps over the boundary lines for appellate review and invades the role which Congress gave exclusively to the Board. I, therefore, respectfully dissent from the majority's opinion.

## I.

The burden is on the party seeking to overturn a Board-conducted representation election to establish that the election was not fairly conducted. *N. L. R. B. v. Mattison Machine Works*, 365 U.S. 123, 81 S.Ct. 434, 5 L.Ed.2d 455 (1961) (per curiam). Whether the challenged conduct tended to interfere with the employees' free choice is to be determined primarily as a function of the Board's discretion. *N. L. R. B. v. A. J. Tower*, 329 U.S. 324, 330, 67 S.Ct. 324, 327, 91 L.Ed. 322 (1946); *N. L. R. B. v. Bancroft Mfg. Co.*, 516 F.2d 436, 439 (5th Cir. 1975), *cert. denied*, 424 U.S. 914, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976); *N. L. R. B. v. Trinity Steel Co.*, 214 F.2d 120, 123 (5th Cir. 1954).

The Board's basic policy is to seek to insure that in selecting a bargaining representative the employees have full and complete freedom of choice. The Board attempts, insofar as possible, to encourage laboratory conditions so that employees may exercise this right. *Hollywood Ceramics, Inc.*, 140 NLRB 221, 224 (1962). Gross misrepresentations with regard to material issues in an election, however, can disrupt these conditions and interfere with the expression of free choice. Yet, neither absolutely precise statements nor complete honesty exist in most election campaigns, and they are not even expected by the employees. Election campaigns, after all, are often hotly contested matters prone to the overstatement of one's own virtues, and the zealous condemnation of the other side's vices. Thus, "the Board must balance the right of the employees to an untrammeled choice, and the right of the parties to wage a free and vigorous campaign with all the normal legitimate tools of electioneering." *Id.*

Reflecting this balance, the Board recognizes that a certain amount of inaccuracy and ambiguity are endemic to campaign propaganda. Hence, to warrant setting aside an election, the Board requires that there be a *substantial* misrepresentation of a material fact, made by one with special knowledge of the true facts and communicated to the parties so shortly before the election that the other party has no opportunity to correct it. *Id.* at 223, 224. Moreover, the misrepresentation must involve facts about which the employees are not in a position to know the truth. *General Knit of California*, 239 NLRB (1978); *Peerless of America, Inc. v. N. L. R. B.*, 576 F.2d 119, 123 (7th Cir. 1978). The mere fact "that a message is inartistically or vaguely worded and subject to different interpretations will not suffice to establish such misrepresentation as would lead [a court] to set [an] election aside." *Hollywood Ceramics Inc.*, 140 NLRB at 224. In fact, "even where a misrepresentation is shown to have been substantial, the Board may still refuse to set aside the election if it finds upon consideration of all the circumstances that the statement would not be likely to have had a real impact on the election." *Id.* The rule could not be otherwise lest the losing party to an election be afforded too great an opportunity to delay the implication of the election results by litigating the accuracy of factual assertions which did not affect the election results. The application of this sound policy to the present facts in my view dictates that we enforce the Board's certification order.

## II.

Vitek objects to the Union's campaign handbill entitled "IUE–Vitek News, No. 3." In this leaflet, the Union asserted that the cost of living in America is rising at the rate of 14% and that at other plants in the area it has negotiated cost of living clauses that increase employee wages regularly "to keep pace with" the cost of living. The employer argues that the cost-of-living clauses are "capped" and "keyed" to formulas that do not guarantee cost-of-living adjustments equal to the actual rise in the cost of living. It contends and the majority apparently holds that this campaign document materially misrepresents the cost-of-living protective clauses the Union negotiated with three other employers and thereby establishes a prima facie case for setting aside the election. In so holding, the majority interprets this handbill to be a Union representation that the cost-of-living clauses in its contracts at Edison Products, Gulton Industries, and Delco Batteries guarantee cost-of-living increases equivalent to the actual rise in the cost-of-living. I do not agree.

The Board found that this handbill nowhere stated that any of its cost-of-living protective clauses would guarantee cost-of-living raises equal to the actual rise in the cost of living. The Company admits this. Nevertheless, it maintains that the employees interpreted the statement "to keep pace with the cost of living increase announced by the U. S. Department of Labor" as an absolute guarantee of "dollar for dollar" protection against inflation.[2] I would hold that it was proper for the Board to interpret this statement not to provide such protection.

Furthermore, the Board recognized that the Union had in fact negotiated cost-of-living protective clauses with the companies in question that did provide their employees with some protection against inflation. Thus, although this document is "vaguely worded and subject to different interpretations," *Hollywood Ceramics, Inc.*, at 224, it is not sufficiently misleading to justify setting the election aside. The Board's conclusion, therefore, in this regard is not so outlandish as to constitute an abuse of discretion. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

Vitek also asserts that it did not have adequate time to respond to this document prior to the election. The document in question, however, invites the Company to speak to the employees at Union meetings on June 6, 1979 (the day before the election) regarding the statements made by both parties during the campaign. Surely, had Vitek felt the matter important enough, it could have taken this opportunity to explain to its employees that the cost-of-living clauses were capped at a certain percentage or keyed to a specific formula that did not provide an absolute guarantee of "dollar for dollar" protection against inflation.

## III.

The majority also objects to portions of the Union handbill entitled "A Story By and For Vitek Workers." The majority attacks this handbill because it states that "Back in the 'good ole' days" the employer's wages were the lowest in the area. I do not feel that the record in this case reveals this statement to be a material misrepresentation of fact. Indeed, Vitek initiated its uniform wage rates on January 2, 1976

---

**2.** In fact, Vitek argues that the handbill guarantees a "dollar for dollar" cost of living increase despite the fact that the leaflet contains the following comment with respect to former President Carter's 7% wage controls:

FLASH

A federal court has just upheld the IUE–AFL–CIO lawsuit charging that President Carter's 7% wage controls are illegal.

This is an important step forward in the union's fight to see that workers at plants such as Vitek are not held down at this time when the cost of living is going up at a rate of 14%.

IUE has performed a service, not just for its own members, but for workers throughout the country, by fighting against wage controls. It shows the strength of our union and our concern for the needs of working people.

(revising them thereafter on October 2, 1976) and offered no evidence to indicate that between January 2, 1976 and October 2, 1976—before the Union came on the scene—its wages were not the lowest in the area. Hence, the Board could reasonably infer that such evidence did not exist.

Moreover, although as of April 15, 1979, Vitek did increase its minimum wage to about $1.00 more per hour than ten other area companies, this took place *after* the Union began its organization drive and had filed its representation petition on April 5, 1979. Accordingly, the Company's comparison of its pay scales with those of other area companies after April 15, 1979 are irrelevant to us since these rates reflect a wage increase given to the employees *after* and not *before* the Union began to organize.[3]

In conclusion, I believe that given the circumstances of this case, the Board could find that the alleged misrepresentations by the Union are not so substantial as to be reasonably expected to have had a significant impact upon an election which the

Union won by a margin of 70 to 45, an election in which they garnered 61% of the total vote. Therefore, the Board did not abuse its discretion in holding that the challenged conduct did not interfere with the employees' free choice.

## V.

Finally, the majority contends that "there is no adequate record here from which to tell whether the RD correctly determined that no hearing was necessary" on the question of whether the Union poisoned the pre-election atmosphere by intimidation. In support of this view, Vitek submitted into evidence the affidavits of several employees and supervisors, pinpointed several employees from whom affidavits were taken, and provided the names of numerous other employees whom it asserted had information relevant to its objections to the election. Vitek's legal counsel, however, was advised that if the Company was unable to provide more specific details with respect to the potential testimony of 17 of

---

**3.** I would also conclude that it was proper for the Board to find that this Union handbill did not materially misrepresent the Company's policies with regard to its safety precautions, or its seniority and discharge programs. In short, the Board found that the Union's campaign statement that "few safety precautions were taken to protect the people from carbon monoxide fumes and when [people] got sick because of the fumes, many of [them] lost pay" was not a material misrepresentation of fact.

In this regard, Vitek argues that extensive safety precautions had been taken and all employees reimbursed for time lost due to the fumes. Yet when the Company was requested to support its assertion with regard to the extensive safety precautions, it was only able to demonstrate that as of February 12, 1979 it had installed a new vent "to increase the amount of outside air entering the plant when the exhaust fans were on."

Second, Vitek's records indicate that on the day the new vent was installed, February 12, 1980, ten employees were sent to a local hospital's emergency room and then home by a doctor due to fume-induced sickness. On February 16 and February 26, 1979, 30 employees and seven employees, respectively, left work due to what they believed to be fume-induced illness. Hence, it was reasonable for the Board to infer that one fresh air vent had not solved the problem.

Third, the record shows that at least ten employees who felt they were suffering from a fume-induced illness, were not paid for all of their lost time. The Company unilaterally determined that seven of these employees failed to substantiate their claim of illness and that no reason existed for it to believe there was a problem with the heating system at the time. But, just because this is Vitek's view, the Board was hardly compelled to believe that, therefore, the Union's opposing view was a material misrepresentation of fact.

In any event, the Union's statements about safety precautions involved matters within the context of the employee's working environment. Thus, the employees were in a position to possess independent knowledge with which to evaluate these statements.

Finally, I also would hold that the Board properly found that the Union did not materially misrepresent the Company's seniority and discharge policies. The Union asserted in its leaflet that before it came on the scene seniority had no effect on promotions and overtime and that employees could be fired with no chance of appeal. Vitek did institute a seniority job-posting program and a grievance procedure on April 2, 1979. But, the Company presented absolutely no evidence that it had a seniority job-posting program or grievance procedure prior to April 2, 1979—that is before the Union began its campaign.

its witnesses, they would not be interviewed. It is well established that the objecting party has the burden of supplying the Board with specific evidence that warrants setting aside an election before the. Board must pursue an investigation. *See National Labor Relations Board Cashandling*, Manual (Part Two) Section 11392.5. In fact, the objecting party has the burden of producing specific evidence tantamount to an offer of proof before the Board is required to hold an evidentiary hearing or pursue an investigation. *Howard Johnson Company d/b/a Howard Johnson Distribution Center*, 242 NLRB 1286 (1979).

The RD properly concluded in this instance that (1) upon the basis of the evidence as a whole the Company failed "to raise substantial or material issues with [regard] to conduct affecting the results of the election" and; (2) that since "no evidence was offered that any of the employees not interviewed possessed any relevant information which would raise material or substantial issues concerning conduct affecting the results of the election, the Board agents acted in accordance with established Board policy in refusing to interview" the employees in question. In this light, the Board has held that

> ... where an objecting party presents prima facie evidence demonstrating that the election was not fairly conducted, we do not hesitate to make the necessary investments of time and money, nor can we then avoid the concomitant delay in making our procedures effective. On the other hand, where there has been no prima facie showing of misconduct ... [it] ... is not only proper but necessary to prevent dilatory tactics by employers or unions disappointed in the election returns.

*Newport News Shipbuilding and Dry Dock Company*, 239 NLRB 82, 83–84 (1978).

## VI.

For the foregoing reasons, I would deny the petition to review and set aside and grant the cross-application for enforcement of the Order of the National Labor Relations Board.