**PEERLESS OF AMERICA, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 77-1646.**

United States Court of Appeals, Seventh Circuit.

Argued March 1, 1978.

Decided May 17, 1978.

§§ 8(a)(1) and 8(a)(5) [1] of the National Labor Relations Act for refusing to bargain with Local 1031, International Brotherhood of Electrical Workers (Union), the certified exclusive bargaining representative of the Company's employees.

The Company admits that it has refused to bargain with the Union, but alleges that the Union was improperly certified. The Company argues that the certification election was preceded by union campaign misconduct sufficient to require that the election be set aside. As there is no direct review of a Board decision regarding representation elections,[2] review typically occurs when an employer subsequently refuses to bargain with the newly certified union and, after the Board finds the employer in violation of § 8(a)(5), the employer petitions for review of the Board's unfair labor practice decision. *Magnesium Casting Co. v. N. L. R. B.*, 401 U.S. 137, 91 S.Ct. 599, 27 L.Ed.2d 735 (1971); *Hecla Mining Co. v. N. L. R. B.*, 564 F.2d 309, 313 (9th Cir. 1977). That is the procedural posture of the present case.

On May 27, 1976, the Board conducted an election in which 137 votes were cast for and 121 against the Union. There were three void and ten challenged ballots which did not affect the results of the election. The Company filed timely objections to the election which were overruled by the Regional Director of the Board on July 20, 1976, at which time the Union was certified. The Company then filed a Request for Review with the Board on August 9, 1976, seeking a new election or at least a hearing on its election objections, both of which were denied on October 1, 1976. After the Company refused to bargain with the Union, the General Counsel issued a complaint charging the Company with violations of §§ 8(a)(1) and 8(a)(5). The Board granted summary judgment against the Company

Lawrence M. Cohen, Chicago, Ill., for petitioner.

Elliott Moore, Deputy Assoc. Gen. Counsel, Robert Sewell, N. L. R. B., Washington, D.C., for respondent.

Before PELL and WOOD, Circuit Judges, and FLAUM, District Judge.*

PELL, Circuit Judge.

This is a petition for review and cross-application for enforcement of a National Labor Relations Board order holding Peerless of America, Inc., (Company) in violation of

---

* District Judge Joel M. Flaum of the Northern District of Illinois is sitting by designation.

1. Section 8(a)(5) provides:

It shall be an unfair labor practice for an employer to refuse to bargain collectively with representatives of his employees, subject to the provisions of section 159(a) of this title.

29 U.S.C. § 158(a)(5).

2. Direct review is available, however, in some very limited circumstances not present here. *See, e. g., Herald Co. v. Vincent*, 392 F.2d 354 (2d Cir. 1968).

on the ground that all issues raised in defense by the Company were or could have been litigated in the prior representation proceeding.

▇▇▇▇ Before proceeding to the merits, we note that the Board has been entrusted with broad discretion in determining the nature and extent of pre-election campaign propaganda that will be allowed, and thus considerable deference must be given to the Board's expertise[3] in this area. *Henderson Trumbull Supply Corp. v. N.L.R.B.*, 501 F.2d 1224, 1228 (2d Cir. 1974); *Follett Corp. v. N.L.R.B.*, 397 F.2d 91, 94 (7th Cir. 1968). We will not upset the Board's decision unless we find that it abused its discretion; however, the Board's findings of fact are conclusive if supported by substantial evidence. *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Hecla Mining Co. v. N.L.R.B., supra.*

The Company's argument that the election should have been set aside or at least that a hearing on the Union's campaign misrepresentations should have been held is based on alleged misrepresentations in three handbills which the Union distributed to the employees on May 24, 25, and 26, the three days preceding the day of the election. The allegations of misrepresentation in the May 24 handbill involve a comparison between the Company's wage scale and that of another, unidentified company represented by the Union. The May 25 and 26 handbills involved alleged misrepresentations regarding the Company's discrimination on the basis of race, sex, and national origin. The Company argues that the Union's conduct, either separately, or in its totality, precluded a fair election. Although we will consider the totality of the Union's conduct, we will segment our analysis in conformity with Board law and thus will address the wage-related misrepresen-

tation in the May 24 handbill separately from the discrimination-related misrepresentation in the other two handbills.

## The May 24 Handbill

The Union distributed a handbill on May 24 which stated in relevant part as follows:

Your employer thinks he can mislead you by quoting from the contract of a company making television sets instead of a company making the same products that you make at Peerless.

Now let's compare your benefits against a Local 1031 company which produces the *same product* you make at Peerless!! The highest rate we know of for a machine operator at your company is $4.23 per hour and most of you employees make considerably less. Under our contract with a company making the same product and doing the same work, all employees are paid more than $4.23 per hour.

[Emphasis in original.] The handbill did not identify the company it compared to Peerless, and Peerless was unable to discover before the election the identity of the other company. The identity of the other company, Square D, emerged for the first time in the Regional Director's decision overruling the Company's election objections and certifying the Union. In its August 9, 1976, Request for Review of the Regional Director's certification decision, the Company alleged that Square D did not, contrary to the May 24 handbill, produce the *same* product as did the Company. It attached, as Exhibit E to its Request for Review, Dun & Bradstreet and Standard & Poor's reports which show that the Union has a contract with Square D at only the Schiller Park, Illinois plant which manufactures, among other things, panelboards,

---

**3.** Although we give deference to the Board's expertise in this area, we note that scholarly criticism for more than a decade has questioned that expertise. *See* J. Getman, S. Goldberg and J. Herman, Union Representation Elections: Law and Reality (1976); Getman & Goldberg, The Myth of Labor Board Expertise, 39 U.Chi.L.Rev. 681 (1972); Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv.L.Rev. 38, 82–92 (1964). Indeed, Board members themselves have questioned the propriety of the standard applied in this area. *See* Member Penello's dissent in *Medical Ancillary Services, Inc.*, 212 NLRB 582 (1974) and former Chairman Miller's views in *Southern Health Corp.*, 201 NLRB 462 (1973). *See* also *Modine Mfg. Co.*, 203 NLRB 527 (1973).

switchboards, unit sub-stations, bolted pressure contract switches, and motor control centers. Peerless, on the other hand, manufactures air conditioning and heating coils. The Company alleged that Square D's manufacturing process was more complex and required a significantly more skilled workforce than does the Company, and therefore, that the wage comparison was inaccurate and highly misleading. The Company did not challenge the accuracy of the Union's statement of Square D's wage scale, but argued simply that the difference in product lines and accordingly the degree of skill of the workers at Square D rendered the comparison a substantial misrepresentation.

■■■■ This case was argued by the parties to us, and we reach our decision, on the basis that the appropriate guidelines for determining whether misrepresentations during a campaign constitute grounds for setting aside the election are the guidelines first set forth by the Board in *Hollywood Ceramics Co.*, 140 NLRB 221 (1962).[4] Under this test, an election should be set aside if there is (1) a misrepresentation of a material fact involving a substantial departure from the truth, (2) made by a party with special knowledge of the truth, (3) communicated so shortly before the election that the other party has insufficient time to correct it, and (4) involving facts about which the employees are not in a position to know the truth. The misrepresentation need not be deliberate so long as it may reasonably be expected to have significant impact on the election.

In the present case, the Union's wage comparison was made by a party with special knowledge of the truth; the Union surely knew the employee skill levels and wage scale at the unidentified company with which it had a contract. The wage comparison was communicated less than three days before the election which left the Company insufficient time to respond, especially in light of the fact that the Company did not know the identity of the company with which it was compared. Furthermore, the employees were not in a position to know the truth regarding the wage comparison because the handbill failed to identify the company. The Board makes the specious argument that the employees were in a position to evaluate the truth of the Union's wage comparison because the comparison was made in the context of a broad exchange between the Union and the Company over the Union's effectiveness in securing wage-benefit improvements for its members. We are unable to perceive how the context of the exchange could place the employees in a better position to know the truth regarding the wage comparison when a quite obvious prerequisite to this knowledge is the identity of the other company. The remaining prong of the *Hollywood Ceramics* test for setting aside an election is whether there was a misrepresentation of a material fact involving a substantial departure from the truth. It is to this issue that we now turn.

The Board argues that the Union's failure to identify the other company and the

4. On April 8, 1977, after the election in this case but before the Board's decision from which review is sought, the Board decided *Shopping Kart Food Market, Inc.*, 228 NLRB No. 190, 94 LRRM 1705 (1977), in which it overruled *Hollywood Ceramics Co.* and devised a new standard for campaign misrepresentations. Under the new standard, the Board is far more tolerant of misrepresentations and will set aside elections in only limited circumstances. The Board reasoned that

our fundamental disagreement with past Board regulation in this area lies in our unwillingness to embrace the completely unverified assumption that misleading campaign propaganda will interfere with employees' freedom of choice.

94 LRRM at 1707. Nevertheless, as *Shopping Kart* was decided after the election but before the Board's decision in the present case, which decision did not advert to *Shopping Kart*, and as the Board's brief and oral argument did not contend that the liberalized *Shopping Kart* standard was here applicable, we apply the *Hollywood Ceramics* test and save for another day our views of the new standard. Cf. *Blackman-Uhler Chemical Division, Synalloy Corp. v. N.L.R.B.*, 561 F.2d 1118, 1119 (4th Cir. 1977), in which the court remanded to the Board for determination of whether *Shopping Kart* should be applied retroactively.

fact that the other company did not, as stated in the handbill, manufacture the *same* product did not constitute a material misrepresentation. Without more evidence, we are of the opinion that the Board abused its discretion in reaching that conclusion. The alleged misrepresentation concerned a wage comparison, and although the actual distortion was allegedly of the comparability of the product line, such a distortion could translate directly to a distortion regarding wages. If the different product line requires higher-skilled employees, a wage comparison with the lower-skilled employees, absent an explanation of the skill differential, results in a clear distortion regarding wages.

Further, the persuasive effect of the particular misrepresentation upon the Company's unit employees was intensified by virtue of being couched in the context that the Company's thought was to mislead the employees by quoting from a contract of a company not making the same products.

Among the various types of campaign misrepresentations, the courts have been least tolerant of distortions regarding wages. In a recent Fifth Circuit case, the court summarized this intolerance.

> [T]he cases place a higher standard of precision on Union statements regarding wages, since wages "are the stuff of life for Unions and members, the self-same subjects concerning which men organize and elect representatives. . . ." Thus, claims "involving wages and benefits based upon unstated hypotheses constitute a prima facie misrepresentation."

*Contract Knitter, Inc. v. N.L.R.B.*, 545 F.2d 967, 971 (5th Cir. 1977). *See also J. I. Case Co. v. N.L.R.B.*, 555 F.2d 202, 205 (8th Cir. 1977); *N.L.R.B. v. Millard Metal Service Center, Inc.*, 472 F.2d 647, 650 (1st Cir. 1973). Moreover, the Board should have scrutinized the Union's misrepresentations with great care in light of the closeness of the election, a factor which merits at least some consideration in assessing the effect of the misrepresentation. *Follett Corp. v. N.L.R.B.*, supra at 95 n. 3.

Although we note the added significance attached to misrepresentations regarding wages and the heightened sensitivity to misrepresentations preceding close elections, we are unable, on the basis of the evidence before us, to evaluate satisfactorily the degree of distortion in the present case. *See N.L.R.B. v. Mr. Fine, Inc.*, 516 F.2d 60, 63 (5th Cir. 1975). The critical evidence that is lacking here is that showing the Square D workforce to be higher skilled and accordingly not fairly compared to that of the Company. The difference in skill levels of the two workforces correlates directly with the degree of distortion of the wage comparison, and therefore is essential information in determining whether the misrepresentation involved a substantial departure from the truth.

This information could have been ascertained if the Board had, as requested by the Company, granted an evidentiary hearing on this issue. An evidentiary hearing should be granted if the objections raise "substantial and material factual issues" which can be resolved only after a hearing. 29 C.F.R. § 102.69(d). *See Louis-Allis Co. v. N.L.R.B.*, 463 F.2d 512 (7th Cir. 1972). The burden is on the party seeking to set aside the election to show what evidence it would present to support its objections. *N.L.R.B. v. Target Stores, Inc.*, 547 F.2d 421, 425 (8th Cir. 1977). We are of the opinion that the Company met this burden and that the Board should have granted a hearing. The Company presented documentary evidence that Square D produced different products than the Company and it presented this evidence as soon as it was made aware that the previously unidentified company was Square D. Moreover, the Company sought an evidentiary hearing at which it would have had an opportunity to prove that the different products produced by Square D required a higher-skilled workforce than those produced by the Company. The Company clearly raised a material factual issue which could be resolved only after a hearing and which, if adequately proved, would warrant setting aside the election. *See Louis-Allis Co. v. N.L.R.B.*, supra.

We do not intimate that the Board should set aside the election if, after the hearing, it finds the differential in skill levels to be *de minimis*. Indeed, we leave to the Board's discretion the degree of skill level difference in the two workforces necessary to render the Union's wage comparison a substantial misrepresentation. Enforcement of the Board's order is, therefore, denied, and the case is remanded for further proceedings in accordance with the views herein expressed.

### The May 25 and 26 Handbills

■ The Union distributed a handbill on May 25, the relevant portion of which read as follows:

Are we paid what we *deserve* for the work that we do? How come *different* workers get *different* rates for doing the same work? How come workers who have been here just a *short* time get more for the same work than those who have been here *longer*?

[Emphasis in original.] Then, on May 26, it distributed a letter from its president, the first paragraph of which read as follows:

Several months ago a committee of Peerless employees asked for our help in organizing the workers of Peerless into a union. They told us the workers were tired of being HARRASSED and DISCRIMINATED AGAINST BECAUSE OF SEX OR NATIONALITY: that they resented the Company's policy of paying DIFFERENT WAGES TO DIFFERENT PEOPLE for the same work; and they wanted seniority and the security of knowing that they would not be fired without good cause!

[Emphasis in original.] The Company argues that these communications were false, irrelevant, and inflammatory charges of racial and sexual discrimination, and that under *Sewell Manufacturing Co.*, 138 NLRB 66 (1962), the Board should have set aside the election. In *Sewell*, the Board set aside

an election because of the employer's inflammatory appeals to racial prejudice, unrelated to election issues, which constituted the core of the employer's campaign. In the present case, however, the Board found that the Company did not meet the *Sewell* test. Although statements such as those in the May 25 and 26 handbills may border on being racially or sexually inflammatory, and although the case may be a close one, we cannot say that the Board abused its discretion in finding that they did not constitute inflammatory appeals to prejudice unrelated to election issues. Moreover, these isolated statements were not reflective of the theme of the Union's campaign. An examination of the three handbills reveals that the substance of the Union's campaign concerned wages, working conditions, job security, and a "better life."

■ If, as here, racial or sexual remarks are injected into an election campaign but do not form the core or theme of the campaign as they did in *Sewell*, and if the remarks are not inflammatory, they should be reviewed under the standards applied to other types of misrepresentation. *N.L.R.B. v. Bancroft Manufacturing Co.*, 516 F.2d 436, 442 (5th Cir. 1975), *cert. denied*, 424 U.S. 914, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976). Under this analysis, the Board did not abuse its discretion.[5] The relevant remarks fall at most into the broad category of "intemperate, abusive and inaccurate statements made by a union during an attempt to organize employees [that] are to be tolerated under the Act . . . ." *Baker Canning Company v. N.L.R.B.*, 505 F.2d 574, 576 (7th Cir. 1974). Although they occurred very shortly before the election, precluding a response by the Company, they were not made by a party with special knowledge of the truth, and they arguably involved allegations the truth of which the employees were in a position to evaluate. *See Hollywood Ceramics, supra*. In the latter connection, we do not mean to indicate that we entertain the view that employees

5. The Company also argued that the Board should have granted an evidentiary hearing on this issue. Unlike with the alleged wage distortion, however, the company did not raise substantial and material factual issues that could be resolved only after a hearing. Therefore, the Board did not abuse its discretion in denying a hearing on this matter.

in an industrial complex are necessarily acquainted with the rate of pay received by their fellow employees; indeed, secretiveness may well be involved in this picture. We do, however, think that the employees here would have been aware of a plant sentiment of resentment against discrimination if it existed. Conversely, if it did not exist, employees would be more than likely aware that the Union was making a statement about a prevailing attitude among workers which was not true.

■ In considering the totality of the Union's conduct, in view of our decision that the last two communications were, considered separately, insufficient to vitiate the election and that the status of the first communication remains uncertain in this respect, we decline to deny enforcement on the totality of conduct basis. We are of the opinion, however, that the Board in such further proceedings as it may conduct with regard to this matter should view the matter of the first communication in the light of the totality of the conduct because of the borderline nature of the final two communications.

ENFORCEMENT DENIED.