**F I L E D**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

HONEYVILLE GRAIN, INC.,

　　　Petitioner/Cross-Respondent,

　　　v.

NATIONAL LABOR RELATIONS
BOARD,

　　　Respondent/Cross-Petitioner.

Nos. 04-9577 & 04-9591

**On Petition for Review and Cross-Application of an
Order of the National Labor Relations Board
(Agency No. 31-CA-26806)**

Robert M. Goldfried (David L. Cohen, with him on the briefs), Cohen &
Goldfried, Los Angeles, CA, for Petitioner/Cross-Respondent.

Jeff Barham (David Habenstreit, with him on the brief), National Labor Relations
Board, Washington, D.C., for Respondent/Cross-Petitioner.

Before **KELLY**, **HENRY**, and **MURPHY**, Circuit Judges.

**HENRY**, Circuit Judge.

　　　This case requires us to determine whether a majority vote for a

representative union was actionably clouded by a sustained or inflammatory

appeal to religious bias. We may set aside the certification of the election only if the National Labor Relations Board ("the Board") incorrectly applied the law or its findings are not supported by substantial evidence. 29 U.S.C. § 160(e); *NLRB v. Velocity Express, Inc.*, 434 F.3d 1198, 1201 (10th Cir. 2006). Consequently, the Board has "wide discretion" in judging the fairness of an election, and a party objecting to pre-election conduct bears a "heavy burden" to prove that there has been prejudice to an election's fairness. *M & M Supermarkets, Inc. v. NLRB*, 818 F.2d 1567, 1573 (11th Cir. 1987).

In this appeal, Honeyville Grain asks us to set aside an election in which its truck drivers at a California facility voted in favor of a union to represent them. Honeyville contends that the union's agents made inappropriate remarks at a union meeting, five days before the election, by referring to the religious beliefs of the company's owners in an attempt to inflame the drivers' religious prejudices. The Board certified the union as the exclusive bargaining agent of the employees, and Honeyville subsequently refused to bargain with the union. The Board later ordered Honeyville to cease and desist from refusing to bargain. In response, Honeyville petitions for review of the Board's order, and the Board cross-appeals to enforce the order. We exercise jurisdiction under 29 U.S.C. § 160(e) and (f). Based on our deferential standard of review, we deny Honeyville's petition for review and enforce the order of the Board.

# I. BACKGROUND

Honeyville Grain is a Utah corporation with facilities in California and Utah. It processes and distributes food products, and it employs truck drivers to deliver its products. In February 2002, the Local 166 of the International Brotherhood of Teamsters, AFL-CIO ("the Union") petitioned the Board for an election in a unit of Honeyville's full-time and part-time truck drivers at the Rancho Cucamonga, California facility. "[T]he Board not only conducts elections, but it also oversees the propaganda activities of the participants in the election to insure that the voters have the opportunity of exercising a reasoned, untrammeled choice for or against labor organizations seeking representation rights." *Sewell Mfg. Co.*, 138 NLRB 66, 69 (1962).

The Board conducted a secret-ballot election at Rancho Cucamonga on April 12, 2002. All thirty-two eligible voters cast ballots; twenty-three voted in favor of the Union, seven voted against the Union, and two ballots were challenged. Later that month, Honeyville filed ten objections to the election. Relevant to this appeal, Honeyville objected to comments made in a meeting held at the Union's office five days before the election; twenty to twenty-five of the drivers attended. Meeting attendees testified that two Union agents, Rene Torres and David Acosta, stated:

1.   Honeyville is run by Mormons;
2.   Honeyville is giving its money to the Mormon Church;
3.   Companies have tax incentive to give profits to churches, which should be shared with the workers instead;
4.   Honeyville's Mormon owners not only give their money to the Mormon Church, but they also give money to the Mormon missionaries; and
5.   Mormons are missionaries, and missionaries speak good Spanish.

Rec. vol. III, at 38-39, 75-76, 149-151, 155-56, 174-76, 298-304, 308.  Mr. Torres is a driver with Honeyville Grain, and Mr. Acosta is a business agent and organizer for the Teamsters Local 396.  Mr. Acosta claimed that he made no reference to missionaries or the Mormon Church at the meeting.

The most extensive testimony came from Enrique Erazo, a Honeyville driver who attended the meeting where the religious remarks were made.  At a Board hearing, Mr. Erazo testified that Mr. Torres stated:

> [The drivers] have rights to benefits.  So, the money the Company was making–was a rich Company and so, the money that the Company was making, they needed to share it with every worker and improve the benefits to workers.
>
> Since the Company was a Company run by Mormons, [the Union] said they would . . . see to it that they would make better contributions–they did to the church and they would also distribute or share that money with Missionaries going out of the country and because the money was tax deductible and that is why they would give part of that money to the Mormon Church, instead of giving it to –sharing it with the workers–the opportunity that they have in order to better their way of life.

*Id*. at 38-39.

Mr. Erazo further testified that the meeting attendees applauded after Mr.

Torres discussed the distribution of the company's profits and referenced the religious beliefs of its owners. Neither party has put forward any evidence about the religious makeup of the unit employees. The religious remarks were made at one of about ten Union meetings held prior to the election.

A Regional Director of the Board investigated Honeyville's objections to the election and directed that a hearing be conducted as to nine of the objections. After the hearing, the Hearing Officer recommended that the Board overrule each of Honeyville's objections, including the objection about the religious remarks, and certify the Union. The Hearing Officer's Report stated:

> [W]ithin the context of the April 7th Union meeting, Acosta and Torres were agents of the Union to the extent that their statements were made to all the unit employees in the presence of Stephenson [the Union's business agent] and to the extent to which Stephenson failed to repudiate their statements. Nonetheless, here, [Honeyville] has not met its burden to show any religious comments were inflammatory in nature. In the context of trying to persuade the unit employees that they should improve their lot, the evidence supports that Torres stated to unit employees that if an organization contributes to a church, then that organization has less profits to share with its workers. He also said that companies have business incentives to reduce their taxes. Within the context of his statement reasonable inferences can be made that Torres was talking about Honeyville and the Mormon Church.
>
> Nonetheless, whether or not Torres's comments are true, the comments are not prejudicial to the extent that the employees would not be able to weigh the truth of the matter to reach their own conclusions. [Honeyville] put forth hearsay (or at least non-probative) evidence that many of the managers at Honeyville are Mormons, yet [Honeyville] did not put forth any evidence of the religions of the unit employees or any evidence concerning why the statements as alleged specifically appealed to religious prejudices that the unit employees may have had.

Additionally, the statement that missionaries speak better Spanish than non-missionaries is equally lacking in inflammatory value, and [Honeyville] has failed to show how and/or if the statements would inhibit the employees in their ability to make an informed decision about how to vote and/or how to evaluate the comments of Torres.

Furthermore, even if hypothetically, [Honeyville] had made a *prima facie* case that the statements were inflammatory, the Union witnesses have provided sufficient context to all the statements to show a non-inflammatory purpose for each and all of the statements.

Rec. vol. V, doc. 15, at 18 (Hearing Officer's Report and Recommendations, dated July 18, 2002) (hereinafter "Recommendations").

The Board adopted the Recommendations and certified the Union as the exclusive collective-bargaining representative for Honeyville's drivers at Rancho Cucamonga. *See id.*, doc. 18, at 8 (Decision and Certification of Representative, dated Feb. 6, 2004) (hereinafter "Certification").

After the Certification, Honeyville refused to bargain with the Union. The Union filed charges with the Board. The Board's General Counsel then issued a complaint alleging that Honeyville had refused to bargain collectively with the Union, in violation of sections 8(a)(1) and (5) of the National Labor Relations Act ("the Act"). *See* 29 U.S.C. § 158(a)(1) and (5). Honeyville filed an answer, reasserting its objections to the Certification, and the General Counsel subsequently filed for summary judgment. The Board granted the motion for summary judgment. Rec. vol. V, doc. 29 (Decision and Order, dated July 30, 2004). The Board concluded that Honeyville violated the Act by its admitted

refusal to bargain with the Union, and it ordered Honeyville to cease and desist from interfering, restraining, or coercing employees in the exercise of their rights under the Act. *See* 29 U.S.C. § 157. The Board also required Honeyville to bargain on request with the Union as the exclusive representative of the drivers.

In response, Honeyville now petitions for review of the Board's Decision and Order, requesting that we set aside the election. The Board cross-appeals to enforce the Decision and Order. This court can review the Board's actions for the limited purpose of deciding whether to "enforc[e], modify[], or set[] aside in whole or in part the order of the Board." *Id.* § 159(d).

## II. STANDARD OF REVIEW

We review the Board's refusal to set aside an election for an abuse of discretion. *NLRB v. DPM of Kan., Inc.*, 744 F.2d 83, 85-86 (10th Cir. 1984). This court reviews de novo the Board's conclusions of law. *Double Eagle Hotel & Casino v. NLRB*, 414 F.3d 1249, 1253 (10th Cir. 2005). "We will grant enforcement of an NLRB order when the agency has correctly applied the law and its findings are supported by substantial evidence in the record as a whole." *NLRB v. Interstate Builders, Inc.*, 351 F.3d 1020, 1027 (10th Cir. 2003); *see* 29 U.S.C. § 160(e) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be

conclusive."). The substantial-evidence test requires only "the degree [of evidence] that could satisfy a reasonable factfinder. Furthermore, if the Board has made a plausible inference from the evidence, we may not overturn its findings, although if deciding the case de novo we might have made contrary findings." *Webco Indus., Inc. v. NLRB*, 217 F.3d 1306, 1311 (10th Cir. 2000) (internal citation and quotation marks omitted). "We do not re-weigh the evidence or second guess the NLRB's factual inferences." *Velocity Express*, 434 F.3d at 1201.

## III. DISCUSSION

The parties agree that the seminal case describing when an appeal to racial or religious prejudice warrants overturning an election is *Sewell Manufacturing Co.*, 138 NLRB 66 (1982). The Board in *Sewell* set aside an election where a union had lost 985 to 331. *Id.* at 70. For four months, employers distributed anti-African-American propaganda materials focused on the union's support for the civil rights movement, including a photo (mailed two weeks before the election) of a white union official dancing with an African-American woman, together with a story about "race mixing." *Id.* at 66-68.

In *Sewell*, the Board described which types of racial references are allowed and which types warrant setting aside an election. It stated:

So long . . . as a party limits itself to truthfully setting forth another party's position on matters of racial interest and does not deliberately seek to overstress and exacerbate racial feelings by irrelevant, inflammatory appeals, we shall not set aside an election on this ground. However, the burden will be on the party making use of a racial message to establish that it was truthful and germane, and where there is doubt as to whether the total conduct of such party is within the described bounds, the doubt will be resolved against him.

*Id.* at 71-72. Appeals to racial or religious prejudices constitute grounds for setting aside election results if "the challenged propaganda has lowered the standards of campaigning to the point where it may be said that *the uninhibited desires of the employees cannot be determined in an election*." *Id.* at 70-71 (emphasis added). As discussed below, a party challenging an election bears the preliminary burden to prove that the remarks at issue were inflammatory or formed the theme of the campaign. If this burden is met, the party who allegedly made the remarks then must prove that they were germane.

Here, the Hearing Officer and the Board concluded that Honeyville bore an initial burden to prove that the remarks were inflammatory, but did not satisfy it. The Hearing Officer found that Honeyville "has not met its burden to show any religious comments that were inflammatory in nature." Recommendations at 18. The Board similarly concluded that Honeyville had not met this initial burden: "[E]ven if [Honeyville's] evidence were fully credited, [Honeyville] has failed to demonstrate that the [Union's] conduct amounted to a sustained inflammatory appeal or a systematic attempt to inject religious issues into the campaign."

Certification at 8 (internal quotation marks omitted).

A.    *The challenging party must first show that the remarks were inflammatory*.

We must initially determine if the Hearing Officer and Board correctly interpreted *Sewell* to place the preliminary burden of persuasion on Honeyville to demonstrate that the religious remarks were inflammatory or the core of the Union's campaign.  This is an issue of first impression in our circuit.  Honeyville asks us to adopt a per se rule that, in a representative election, the party making use of the religious message bears the initial burden to show that the message was germane to the issue; if that party cannot do so, the election should be set aside.  Honeyville also maintains that a party making religious comments has the separate burden to prove the comments were not inflammatory.  The company, however, cites no Board or appellate decision adopting such a rule, and likewise, we have found no authority for the proposition.

Instead, courts have followed a general burden-shifting regime that the Board described in its Certification, and we adopt such an approach here.  *Sewell* and the appellate courts interpreting that decision require a party challenging a representative election first to demonstrate that the religious remarks were inflammatory or formed the core of the campaign.  If this burden is satisfied, the burden then shifts to the party making the remarks to prove that such comments were "truthful and germane," as *Sewell* explains.  138 NLRB at 72.  Remarks not

found to be inflammatory or the core or theme of the campaign are reviewed under standards applied to other types of misrepresentations. *See DPM of Kan.*, 744 F.2d at 86 ("adopt[ing] the rule that elections will not be set aside because of misleading campaign statements, absent the use of forged documents or the alteration of an official Board document in a manner suggesting that the Board favors one of the parties").

This framework accords with other circuits that have explicitly discussed a party's initial burden when challenging pre-election racial and religious remarks. *See, e.g.*, *Case Farms of N.C., Inc. v. NLRB*, 128 F.3d 841, 845 (4th Cir. 1997) ("The Board has made clear in the cases following *Sewell* that appeals to race or ethnicity must be 'inflammatory' in order to violate the *Sewell* standard."); *KI (USA) Corp. v. NLRB*, 35 F.3d 256, 260 (6th Cir. 1994) ("When a party . . . establishes a prima facie case [of] an 'inflammatory appeal' to racial feelings, . . . then the burden shifts to the party using the racial appeal to show that its remarks were 'truthful and germane.'") (quoting *Sewell*, 138 NLRB at 71-72); *NLRB v. Silverman's Men's Wear, Inc.*, 656 F.2d 53, 58 (3d Cir. 1981) (concluding that "the burden of establishing the legitimacy of the remark shifted to the Union" after determining the remark "falls within the *Sewell* definition" of being inflammatory); *Peerless of Am., Inc. v. NLRB*, 576 F.2d 119, 125 (7th Cir. 1978) ("If . . . racial or sexual remarks are injected into an election campaign but do not

form the core or theme of the campaign as they did in *Sewell*, and if the remarks are not inflammatory, they should be reviewed under the standards applied to other types of misrepresentation."), *overruled on other grounds by Mosey Mfg. Co. v. NLRB*, 701 F.2d 610 (1983); *NLRB v. Sumter Plywood Corp.*, 535 F.2d 917, 925 (5th Cir. 1976) (stating that "the reversal of burden of persuasion [from the party challenging the election to the party who made the remarks] occurs if the racial remarks form the core or theme of the campaign, or if the statements are racially inflammatory") (internal quotation marks omitted).

Having determined that the Board correctly placed the preliminary burden of proof on Honeyville, we examine whether the Board had substantial evidence to conclude that the religious remarks were not inflammatory or the theme of the Union's campaign.

B.      *Substantial evidence supported the Board's findings that the remarks were not inflammatory or the theme of the campaign.*

In *Sewell*, the Board was concerned with a party's "deliberate" attempt to "overstress and exacerbate racial feelings by irrelevant, inflammatory appeals," 138 NLRB at 72, but it did not define what constituted "inflammatory appeals." The Board did make it clear, however, that it works to conduct elections free from "elements which prevent or impede a reasoned choice," *id.* at 70, and it will not "tolerate as 'electoral propaganda' appeals or arguments which can have no

purpose except to inflame the racial feelings of voters in [an] election," *id.* at 71.

Furthermore, the Seventh Circuit has explained that "[a] statement is racially inflammatory on its face if it is intended to produce or exploit strong racial prejudice, and is in fact likely to produce or exploit such racial prejudice." *State Bank of India v. NLRB*, 808 F.2d 526, 541 (7th Cir. 1986). These principles described by the Board and the Seventh Circuit apply similarly to inflammatory religious comments.

With this advice in mind, we look at the Board's findings about the Union's religious remarks:

> The Board in *Sewell* distinguished between sustained, deliberate, calculated appeals to racial prejudice (as in that case) and isolated, casual remarks appealing to prejudice. 138 NLRB at 70-72. Accordingly, since *Sewell*, the Board has consistently refused to overturn elections on the basis of comments with racial or religious overtones, even when they were inaccurate or gratuitous, when the comments were not inflammatory or part of a sustained, persistent attempt to appeal to the racial or religious prejudices of eligible voters.[1]

---

[1] In the Certification, the Board cited three unsuccessful challenges by an employer to set aside an election based on a union's alleged comments during a campaign. *See Catherine's Inc.*, 316 NLRB 186, 186, 189 (1995) (concluding that a union representative's comments–that the company's attorney was Jewish, "he has a Jewish law firm," and "Jewish people" "would sit down and negotiate a contract with you" if they lost–did not constitute a basis for setting aside the election "since they do not rise to the level of religious slurs, and were neither intended to nor had the effect of infecting the election atmosphere with religious prejudice or intolerance"); *Brightview Care Ctr.*, 292 NLRB 352, 352 & n.2 (1989) (determining that employees' alleged remarks–that "the owners would not give us raises because they were Jews and cheap" and "maybe Hitler did the right (continued...)

-13-

Relevant to the inquiry are the context in which the statements are made, and the "total conduct" of the person making the comments. [*Id.*] at 72.

Applying these principles, we adopt the hearing officer's conclusion that the [Union's] conduct here did not so lower the standards of campaigning that the uninhibited desires of the employees could not be determined in an election. We find that, even if the evidence were fully credited, [Honeyville] has failed to demonstrate that the [Union's] conduct amounted to a "sustained inflammatory appeal" or a "systematic attempt to inject religious issues into the campaign."

Considering both the context and the [Union's] total conduct, we find that the [Union] did not overstress or exacerbate religious prejudice. The comments at issue were made at only one of about 10 union meetings. [Honeyville] offered no evidence that there was any other injection of religious comment into the campaign (through

---

[1](...continued)

thing"–were "isolated remarks made by unidentified employees, apparently in the course of casual conversation among employees"); *Beatrice Grocery Prods., Inc.*, 287 NLRB 302, 303 (1987), *enforced*, 872 F.2d 1026 (6th Cir. 1989) (unpublished) (finding substantial evidence to support the Board's conclusion that a union organizer's one-time comments to a mostly African-American workforce, in which he criticized the company's alleged racism and stated that the company had called the workers "dumb niggers," were neither the theme of the campaign nor intended to encourage racist attacks against particular ethnic groups).

The Board has similarly handled union challenges to a company's alleged racial remarks in a campaign. *See, e.g.*, *Coca-Cola Bottling Co.*, 232 NLRB 717, 717-18 (1977) (certifying an election in which the union lost and had argued that a company supervisor stated to four African-American employees–out of 106 eligible voters–that a potential steward, if the union won the election, would be biased against African-American employees); *Allen-Morrison Sign Co.*, 138 NLRB 73, 74-75 (1962) (certifying an election in which the union lost after the company had sent letters to all employees explaining how the national union supported integration, and noting that the employer's letter "was temperate in tone and advised the employees as to certain facts concerning union expenditures to help eliminate segregation").

literature or other means); thus, religion was neither the core nor the theme of the campaign. Nor did [Honeyville] offer any evidence showing a history of preelection tension. Any appeal to religious prejudice–if, indeed, there was such an appeal–certainly does not appear to have been a deliberate and calculated attempt to so inflame religious prejudice that the employees would vote against [Honeyville] on religious grounds alone. In any event, we find that the [Union's] remarks would not have the "likely effect" of "prevent[ing] or imped[ing]" employees from making a "reasoned choice" in the election. [*Id.*] at 70.

In sum, because [Honeyville] failed to demonstrate that the [Union], through its preelection conduct, overstressed and exacerbated racial or religious feelings through a deliberate appeal to prejudice, its [objection] does not provide a basis for setting aside the election.

Certification at 6-8 (footnotes and certain citations omitted).

At the outset of our review, let us be clear: the Union agents' references to

the religious belief of Honeyville's owners at this meeting were wholly

inappropriate for any representative campaign, and in no way do we condone such

remarks. Religious prejudice can work in subtle ways. We are *particularly*

troubled by the testimony that the employees applauded after the Union

representative's discussion of Honeyville's profits and incentives to contribute to

the Mormon Church.

But we must also keep in mind that our case law accords considerable

deference to the Board's factual findings, and our review here–of whether

substantial evidence supports those findings–is "a narrow one." *Webco Indus.*,

217 F.3d at 1311. "The 'substantial evidence' test *itself* already gives the agency

-15-

the benefit of the doubt, since it requires not the degree of evidence which satisfies the court that the requisite fact exists, but merely the degree that *could* satisfy a reasonable factfinder." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 377 (1998). Also, we must examine the allegedly inflammatory appeal in the context of the "totality of circumstances surrounding [the Union's] remarks." *Silverman's Men's Wear*, 656 F.2d at 60.

Based on our standard of review and the record considered as a whole, we conclude that substantial evidence supported the Board's findings that the pre-election remarks were not inflammatory and did not form the core or theme of the Union's campaign.

1. The religious remarks were not inflammatory.

Perhaps most importantly, the Union's religious comments did not explicitly disparage Mormons or reference the owners' religion in an overtly abusive or gratuitous manner. The remarks also did not employ vulgarity or profanity to signal that Honeyville's owners deserved particular disdain. *Cf. YKK (U.S.A.) Inc.*, 269 NLRB 82, 84 (1984) (setting aside an election because of a union's repeated references to the company's owners as "Japs" and "damn Japs," together with printed materials stating "Remember Pearl Harbor," "Japs Go Home," "Japs speak with forked tongue," and "slant eyes"); *Schneider Mills, Inc. v. NLRB*, 390 F.2d 375, 377, 379-80 (4th Cir. 1968) (finding inflammatory a

union handbill, alleging that the company president wanted to burn to death two female union employees and further comparing the president's "filth" to Hitler). We can therefore distinguish the facts here from *Silverman's Men's Wear*, a Third Circuit case on which Honeyville primarily relies.

In *Silverman's*, a union officer allegedly called the company's vice-president a "stingy Jew" at a meeting attended by twenty of the fifty-six employees, six days before the election. 656 F.2d at 55. The court found "no reason for the remark except to inflame and incite religious or racial tensions," *id.* at 58, and labeled the one-time comment as a "bald, bigoted slur," *id.* at 59 n.10. The Third Circuit concluded that the alleged remark "[fell] within the *Sewell* definition" of being inflammatory "because of its sensitive nature," even though the alleged remark was not repeated. *Id.* at 58. The court remanded the case for a hearing to determine if the remark warranted a new election.[2]

The Board characterized the Union's religious remarks here differently than the alleged "stingy Jew" comment in *Silverman's*. Pointing out the fact that Honeyville's owners are devout and give money to their church and its missionaries is substantively different than "the directly abusive remark alleged" in *Silverman's*. *Id.* at 59 n.10. Here, the Union agents sought to tie the comments

---

[2]Following a hearing, the Board concluded that testimony of the employer's witnesses was "unreliable" to establish that the union representative made any racial or religious slur. *Silverman's Men's Wear*, 263 NLRB 191, 193 (1982).

to a relevant employee issue–how the company distributes its profits–and we do not believe the remarks incited religious tension in the same way as a racial or religious slur intended solely for inflammatory appeal. In short, the remarks regarding Honeyville's allocation of financial resources did not rise to the level of an abusive religious slur. *Cf. NLRB v. Katz*, 701 F.2d 703, 705-08 (7th Cir. 1983) (denying enforcement of a Board's petition where a Roman Catholic priest actively supporting a union's efforts referred to the company's owners as Jewish, discussed the movie "Holocaust," and stated that the Jewish owners are "getting rich while we're getting poor," during a union meeting at a Catholic church to a workforce comprised largely of Catholics).

Further, Honeyville has not shown how another alleged remark–that Mormons are sometimes missionaries, and missionaries speak good Spanish–appealed to the employees' religious prejudice. As we noted earlier, neither party has described to us the religious make-up of the unit employees. We only know that at least some (and maybe all) of the drivers spoke Spanish. The union agent making that remark, Mr. Torres, denied that his two references to missionaries during the meeting had negative connotations.

Also, notably, the Third Circuit's decision in *Silverman's* was in a different procedural posture. The court there analyzed the Board's findings to determine if the objecting party presented evidence that "raised substantial and material

factual issues, so as to require a hearing." 656 F.2d at 55. The Third Circuit concluded that the allegations met that burden and needed to be properly explored at a hearing. Here, Honeyville has already had the benefit of a hearing, and we only determine on appeal if substantial evidence supports the Board's findings in light of the hearing testimony and the record considered as a whole.

2. The religious remarks were not a central theme of the campaign.

Finally, the isolated remarks were clearly outside of the core issues of the Union's campaign and there was no evidence of pre-election religious tension, and Honeyville does not dispute the Board's findings as such. *See State Bank of India*, 808 F.2d at 542 (concluding that a union's isolated racial remark–about a company's efforts to keep depressed working conditions and low wages because most employees were of minority groups–was not "sufficiently close to the core theme of the campaign"); *NLRB v. Utell Int'l, Inc.*, 750 F.2d 177, 180 (2d Cir. 1984) (holding that "typical economic issues were the essential themes of the election campaign" and the false accusations of racism were non-inflammatory). As the Board noted here, the references to Honeyville's owners as Mormons occurred five days before the election, but at only one of about ten Union meetings organized during an extended campaign. *See Arlington Hotel Co. v. NLRB*, 712 F.2d 333, 338 (8th Cir. 1983) (determining that a union's one-time references to Hitler and slave ships in describing the company's management did

not have inflammatory effect and were not the campaign's central theme).

Further, Honeyville has not shown any pre-election religious "tension" between the company and its employees that may have been exacerbated by the isolated religious remarks. *Cf. NLRB v. Eurodrive, Inc.*, 724 F.2d 556, 559 (6th Cir. 1984) (concluding that a Board hearing was warranted when a union organizer's statement "concerning the white employees' need for protection" was "in itself, insufficient to establish any particular intent to exacerbate racial feelings among the employees," but the statement "placed an undue emphasis" on racial issues "in light of the pre-existing racial tension that existed at the time the alleged statements were made"). The Board specifically noted the absence of "any evidence showing a history of preelection tension" in its Certification, and contrasted Honeyville's election with campaigns involving "a history of preelection tension, [where] even an isolated reference to race or religion could constitute a sustained inflammatory appeal." Certification at 8 & n.5.

## IV. CONCLUSION

The party challenging an election on the basis of pre-election religious comments must initially show that the remarks were either inflammatory or formed the core or theme of the campaign. Here, Honeyville did not satisfy this preliminary burden. While we in no way condone the inappropriate, unwarranted,

and unjustified religious references, substantial evidence from the record considered as a whole supports the Board's conclusion that the comments were not inflammatory or central to the Union's campaign. "[I]f supported by substantial evidence, we must affirm the Board's conclusions *even though we might reach a different result were we reviewing the record de novo*." *Pub. Serv. Co. of Colo. v. NLRB*, 405 F.3d 1071, 1077 (10th Cir. 2005) (quotation marks omitted) (emphasis added). The Board did not abuse its discretion when it declined Honeyville's request to set aside the election. Accordingly, we DENY Honeyville's petition for review, and we ENFORCE the order of the Board.

04-9577, and 04-9591, *Honeyville Grain, Inc. v. NLRB*

**KELLY**, Circuit Judge, dissenting.


Given the small number of eligible voters, this was a close election.  In

absolute numbers, it was far closer than <u>Sewell Mfg. Co.</u>, 138 NLRB 66 (1962),

where a 654 vote difference dictated the outcome.  <u>Id.</u> at 66.  A shift of just nine

votes, given that two apparently were challenged, would have altered the result.

Five days before the election, the union organizers were obviously trying to incite

the employees to vote for the union.  What better way than to point out that the

owners or managers of the company were of a different faith and that the money

they contributed to their church instead rightfully belonged to the workers?  It is

common knowledge that members of the LDS Church tithe.[1]  With all due respect

to the majority, religious bigotry is blatant in this case.  The court's resolution,

taking comfort in the apparent absence of overt abuse, vulgarity, or profanity in

the union organizers' diatribe, simply misses the forest for the trees.

The court states, as it must, that the references to the religion of

Honeyville's owners "were wholly inappropriate," not to be condoned, and

particularly troubling given the employee applause that followed these comments.

---

[1]  The comments also disparaged the company, Honeyville, Inc., based upon its alleged charitable contributions which were deductible for federal income tax purposes.  A corporation may deduct charitable contributions from taxable income, subject to a maximum of ten percent of such income.  I.R.C. § 170(b)(2). No evidence in this record suggests that Honeyville made such contributions.

Although the court's holding is couched in deference, we need not defer to patently incorrect factual findings. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ("Congress has . . . made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial."). Ignoring the obvious, the ALJ and the NLRB held that the statements in question were not an attempt to inject religious issues into the campaign by appealing to religious prejudice against the company and its owners. That conclusion is simply transparent. The only purpose of such comments was to mobilize the employees against their employer by suggesting that the employer preferred the religious interests of its owners over the welfare of its employees. See NLRB v. Silverman's Men's Wear, Inc., 656 F.2d 53, 58 (3rd Cir. 1981) (noting that, as was the case here, the "remark, rather than identifying any position of the Employer . . . has no purpose except blatantly to exploit religious prejudices of the voters"). This more than adequately satisfies a prima facie case of inflammatory remarks sufficient to shift the burden to the union to prove the remarks were truthful and germane. Were there any doubt, one need only consider the balance of those remarks. Id. at 59 ("[T]he allegations in the Company's objection raised a prima facie case that [the] religious slur did impermissibly infringe on the employees' freedom of choice.")

The union agents did not stop after slurring the Mormon church. The next

-2-

target was real or imagined contributions to Mormon missionaries. Finally came the non-germane commentary on the ability of the stereotypical missionaries to speak "good Spanish," yet another reason to distrust the owners.[2] In my view, this case cannot be meaningfully distinguished from Silverman's. There, the Third Circuit held that a union official's referring to a company official as a "stingy Jew" required the union to meet the burden of establishing the legitimacy of the remark, an impossible burden. Id. at 58. Indeed, this court's attempts to distinguish Silverman's are not particularly availing. While it is true that Silverman's remanded for a hearing and our review is for substantial evidence, the Third Circuit made it clear that calling a company official a "stingy Jew," regardless of the labor policies of the company, could not be legitimate; the issue on remand was whether the union could prove that the remark was harmless. Silverman's, 656 F.2d at 60.

This court also indicates that the Mormon discourse was an isolated incident, not the central theme of the union's campaign. That rings hollow when one considers the nature of the ten "meetings" between the union and the employees. Although Mr. Stephenson testified that ten meetings occurred, III R.

---

[2] Virtually all of the drivers spoke **only Spanish**. III R. Tr. at 36 (An employee, testifying through an interpreter, noted that "Mr. Raul . . . was the Interpreter for everybody because [Mr. Stephenson] does not speak Spanish and we do not speak English.").

at 421, the culmination of the union's campaign occurred at the April 7th formal meeting where all or virtually all of the drivers were present. Prior to that, all that occurred was a series of informal encounters between employee organizers and substantially less than all of the employees. These informal encounters are nowhere near the equivalent of the April 7th meeting or rally. As such, the court's conclusion that these statements were only an isolated incident bears no merit. Further, it strains credulity to suggest, as the court has, that under the "totality of the circumstances" these comments were not inflammatory, particularly given the employees' embracing the comments with applause. Id. at 39-40. The comments in this case came at a critical time in the organizing process, were reprehensible and had absolutely no proper purpose in the election. I dissent.